839 So.2d 106 (2003)
STATE of Louisiana
v.
Luis RODRIGUEZ.
No. 02-KA-334.
Court of Appeal of Louisiana, Fifth Circuit.
January 14, 2003.
*110 Paul D. Connick, Jr., District Attorney, Jefferson Parish, Terry M. Boudreaux, Alan Alario, II, Assistant District Attorneys, Gretna, LA, for State.
Christopher A. Aberle, Mandeville, LA, for defendant-appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., SOL GOTHARD and CLARENCE E. McMANUS.
*111 CLARENCE E. McMANUS, Judge.

STATEMENT OF THE CASE
On October 30, 1997, a Grand Jury for the Parish of Jefferson returned a bill of indictment charging the defendant, Luis Rodriguez, with one count of second degree murder and one count of attempted second degree murder, charges to which the defendant pled not guilty at arraignment. After a hearing, the trial judge denied the defendant's motion to suppress identification, motion to suppress evidence, and motion to suppress statement.
Trial began on September 21, 1999 and lasted until October 1, 1999, when the twelve-person jury found the defendant guilty as charged on both counts. The defendant filed a motion for new trial on the basis of jury misconduct. After taking testimony from the former jury members, the trial judge denied the defendant's motion for new trial on February 17, 2000.
On February 22, 2000, after a statement from the deceased's mother, the trial judge sentenced defendant to life imprisonment on count one and to fifty years of imprisonment on count two. Both sentences were ordered to be served at hard labor without benefit of probation, parole or suspension of sentence, and to be served concurrently with each other. The State filed a multiple offender bill of information alleging defendant was a second felony offender. The defendant denied the allegations. After a hearing, the trial judge found the defendant to be a second felony offender, vacated defendant's original sentence on count two, and imposed a sentence of seventy-five years at hard labor without benefit of probation, suspension of sentence or good time. The defendant now appeals.

FACTS
On the night of August 31, 1997, Danny Heiness, who was eighteen years old, was shot in the head in the parking lot of Don Carter's bowling alley in Kenner. Another boy, Danny Landry, was shot in the hand. According to Dr. Frazier McKenzie, Heiness sustained a perforating wound to the brain. The doctor explained that the bullet had entered in the back of the head and exited the front. Dr. McKenzie opined that the shot was fired at a distance more than two feet from Heiness.
Detectives Thomas Powell and Mark Ortiz responded to the scene of the shooting at approximately 11:00 p.m. Detective Powell testified that the police had retrieved a .45 caliber shell casing from the scene. The police also interviewed several of the witnesses, four of whom believed that they could identify the shooter. Detective Powell stated that at some point on September 1, 1997, the police developed a lead. Detective Powell compiled a photographic lineup that contained defendant's photograph along with several others. Detective Ortiz showed the lineup to three of the four witnesses, Daniel Landry, Jeffrey Clark, and Ernie Gardner. The first two positively identified the defendant as the shooter, while Ernie Gardners identification was classified as "tentative." Detective Ortiz testified that he reported his results to Detective Powell, who then secured a warrant for the defendant's arrest and search warrants for the defendant's vehicle and residence. While executing the search warrants, the police seized a blue knit "Tommy Hilfiger" cap, a pair of "London & London" denim overalls, a gold cross, and several photographs, all of which were subsequently entered into evidence. Both Detectives Ortiz and Powell stated that some of the photographs depicted the defendant wearing a cross around his neck, and making hand signals that officers believed were "gang signs."
After his arrest, defendant waived his constitutional rights and gave a statement *112 in which he admitted that he went to Don Carter's at approximately 9:00 p.m. that night, but left at approximately 10:15 p.m. Defendant denied being affiliated with a gang and acknowledged that he had heard about the shooting on television.
Daniel Landry, who was twenty-one at the time of trial, testified that he and Heiness went to the bowling alley that night to play pool. Other friends of theirs, Chucky Brower, Jeffrey Clark, and Robert Craig, were also at the bowling alley that night. According to Landry, Chucky was a member of the "31st Hoover" gang. Landry related that a person whom he did not recognize attempted to start a fight with Chucky, who was wearing a "31st Hoover" necklace. A short while later, the person and Chucky shook hands, which calmed the situation. After this incident, however, five or six Spanish males kept walking by him and his friends. A few minutes later, Heiness told Landry that someone asked Heiness to come outside. When Landry and Heiness walked outside, there was a group of people "smiling and laughing." Heiness asked who wanted him outside, but no one responded. Heiness and Landry returned inside. Later, Heiness and Landry went to the parking lot to obtain some change from Heiness car for the pool table. While Heiness was getting change, Landry saw a man, whom he later identified as the defendant, walking around the parking lot. Landry told Heiness that he was worried that a fight might ensue, and Heiness replied, "Well, if we get in a fight, were just going to have to handle our business."
As Heiness and Landry walked toward the bowling alley, the rest of their friends were walking out into the parking lot. Landry said that he saw the defendant walk behind the group. Landry told his friends, "You all watch out, we might get into a fight." One of his friends responded that no one was going to fight them, and Landry said, "All right." Shortly thereafter, Robert Craig, who was the last in the group, told them to stop walking. Landry looked behind him and noticed that the defendant was four or five feet away from Craig. According to Landry, the defendant said, "You about handling business?" Craig replied, "We what?" Then Landry saw the defendant pull a gun from his overalls, cocked it, and then fired. Landry said that he and Craig ducked and began running. When they got a short distance away, they noticed Heiness was not there. They began returning to the scene, but were intercepted by a police officer on the way to the scene. Landry was shot in the hand, and he found out later that his friend had been mortally wounded.
Landry said that he saw the shooter's face clearly, and described him as a "black male, skinny," wearing blue jean overalls with the right strap hanging down, a black and blue shirt, with a black "cango" hat. Also, Landry said the shooter was wearing a gold cross, "with a little Jesus in the middle." Landry identified the pendant that was seized from the defendant's home as the one that the shooter wore. However, Landry said that the hat seized from defendant's home was not a "cango" hat.
According to Landry, he could not completely see the shooter's hairstyle because of the hat, but stated that the shooter's hair was shaved on the sides. He did not remember seeing a pony tail or pig tail. Further, Landry said that he thought the shooter was wearing one diamond earring, but was not certain. Landry stated that he had positively identified the defendant from the photographic lineup that he was shown, and he acknowledged that he had no doubts that the defendant was the shooter. When shown a photograph of Jorge Serrano, Landry said that he did not *113 see that person at the bowling alley that night.
Landry clarified that Chucky was in a gang, but that none of the rest of his friends who were there that night was in a gang. According to Landry, Robert Craig considered himself to be a gang member, but Landry did not. Twenty-year-old Jeffrey Clark related essentially the same account of the events immediately preceding the shooting. Additionally, Clark said that the defendant was with the person who had made a remark to Chucky earlier in the evening. He too denied that any of the group other than Chuck was a gang member, and that Chuck belonged to the "31st Hoover" Cripp gang. Clark said that he saw the shooter clearly, since Clark was only ten feet from him. According to Clark, the shooter wore overalls with the right strap hanging down. Clark identified the pendant seized from the defendant's residence as the one worn by the shooter. Additionally, Clark stated that the shooter wore a "blue denim cango hat" that was turned around backwards, and that the shooter had "like a braid going down the back of his neck."
When the prosecutor showed Clark the photograph of defendant taken at the time of his arrest, Clark acknowledged the defendant did not have a braid. However, Clark denied that the fact defendant did not have a braid at the time of his arrest failed to change his mind that the defendant was the shooter. When shown a photograph of Serrano, Clark was not sure if he had seen Serrano that night. But, Clark stated that Serrano did not resemble the defendant. Finally, Clark stated that he was 90 percent certain the defendant was the shooter when he identified him from the photographic lineup, but after seeing the defendant in person at a prior motion hearing, Clark was 100 percent sure of his identification. Clark also identified the defendant in court.
Robert Craig corroborated much of the foregoing testimony leading up to the shooting. Craig added that the defendant asked whether Craig was a Cripp. When Craig answered affirmatively, the person uttered an expletive and fired the gun. Craig said that the shooter wore a maroon long-sleeved shirt, overalls with one of the straps unhooked and a black "cango" hat. Craig identified the pendant seized from the defendant's residence as the one worn by the shooter. According to Craig, the shooter had a "little rat tail" hanging down. However, he said that the fact that the defendant did not have a rat tail in his arrest photograph did not change his identification of the defendant as the shooter. When shown a photograph of Serrano, Craig denied that he had seen Serrano at the bowling alley. Further, Craig said that Serrano did not resemble the defendant.
Craig believed that the other guys in the parking lot were gang members because they were all "Spanish" and the Latin Kings gang was near Don Carters. Finally, Craig said that he was no longer a member of a gang.
Ernie Gardner testified that he was in the bowling alley that night for a birthday party, but did not know Landry, Heiness, Craig or Clark. However, Gardner said he saw the shooting from approximately 100 feet away. According to Gardner, the shooter wore overalls, a "cango" hat, a white and blue denim long-sleeved shirt, and a gold and silver cross. Gardner stated that he was not positively able to identify the shooter from either a photographic lineup or a physical lineup. Garner acknowledged that he could not remember which photograph he had chosen. Regarding the physical lineup, Gardner noted that, although he was not positive about *114 his identification of the defendant, he eliminated the other subjects. When shown the pendant seized from defendant's home, Gardner replied that it "could be" the one, but he was not sure. When shown a photograph of Serrano, Gardner stated that he did not recognize the person, but that the person did not look like the shooter. Hans Sinha, a former assistant district attorney, testified on behalf of the State that he had presented the defendant's case to the grand jury. Further, he said that he had arranged the physical lineup attended by Ernie Gardner. Mr. Sinha acknowledged that the defendant's attorney, Martin Regan, wrote a letter requesting that Serrano be included in the physical lineup. However, Mr. Sinha did not believe that the lineup would have been fair because Serrano and defendant did not resemble each other. Accordingly, Mr. Sinha declined to include Serrano among the persons in the lineup.
The State's theory of the case was that the defendant and Jorge Serrano had conspired to have Serrano claim responsibility for the murder because Serrano was already serving a 20-year sentence at hard labor on a rape conviction. To that end, letters written in Spanish from Serrano to the defendant and vice versa, were seized from their respective prison cells. The letters were translated into English, and Juan Blanco, an expert Spanish translator, testified that the translations were accurate. Further, Mr. Blanco read each translated letter to the jury. The letters reflect that the defendant considered Serrano his brother, and the defendant expressed his affection for Serrano in the letters. In one of the letters, defendant inquired whether Serrano still wanted to help the defendant, and in another, he asked whether Serrano had the tattoo with the "five points" made. In the same letter, defendant urged Serrano to "have everything memorized when the party begins."
In one of Serrano's letters to the defendant, he responds that he is going to have two tattoos made, "the crown and the five points." He says that he is ready to go to court with the defendant and "begin the fight." Just before resting, the State had Serrano display his tattoo to the jury.
Through an interpreter, Jorge Serrano testified that he committed the murder, not the defendant. Serrano related that the defendant was not at the bowling alley at the time of the shooting. Serrano claimed that he acted in self-defense because the victim and his friends wanted to kill him in light of his status as a Latin Kings gang member. Serrano related that he fired the gun when one of the victim's friends reached into his clothes. Believing that the person was reaching for a gun, Serrano fired at the "biggest one in the group." Serrano stated that a friend, who was not the defendant, drove him from the scene in a black Nissan Altima. An hour later, another friend, whom Serrano also refused to name, drove him to Miami where Serrano stayed with another friend, whom he refused to name. Serrano returned to Louisiana three months later when he was arrested for allegedly raping his former girlfriend. When he was brought to jail, Serrano saw the defendant there. Serrano learned that the defendant had been arrested for the crime he had committed. Serrano denied that he was lying in order to save the defendant from prison. Further, Serrano stated that he was brought to the district attorneys office and made a statement that he had committed the offense. When he was asked whether he wanted to speak with a lawyer, he answered affirmatively. Serrano explained that he did not say anything else because no lawyer was present on his behalf. Finally, Serrano claimed that he sold the gun to "Felix," who was later identified as Felippe Gomez. The defense *115 established that the .45 caliber casing found at the scene was fired from a gun that was later unlawfully discharged in a bar by Felippe Gomez, with whom both the defendant and Serrano were acquainted.
Christy Mora testified that she was at Wendy's near the bowling alley and heard the gunshot. She stated that she noticed a person carrying a weapon enter the passenger's side of a black Nissan Altima. Ms. Mora said that she could not see the person's face, however. The defense also called Frank DeSalvo, who acknowledged that he had represented the defendant earlier in the case. Mr. DeSalvo stated that he was informed that someone else had committed the shooting, and met with a person in that regard at the prison. However, Mr. DeSalvo testified that the person said nothing. The defendant admitted that he had been at the bowling alley earlier on the evening of the shooting but stated that he arrived at his home on Baylor Street at approximately 10:15 p.m. Defendant denied that he committed the crimes for which he was charged. Defendant further claimed that Serrano did not act in self-defense but actually committed the crime to advance his position as a Latin Kings gang member. Defendant denied being a member of a gang, and removed his shirt to demonstrate to the jury the absence of gang tattoos. He denied owning the overalls that had been seized from his home. Defendant stated that the pants were not a man's garment, since there was no zipper in the front. Defendant denied that he and Serrano had confected a scheme by which Serrano would take responsibility for the crime. Finally, defendant claimed that he did not wear his hair in a pony tail. Rather, defendant described his hairstyle as a "poopy doo," which is characterized by more hair on top with the sides and back of the head shaved. During trial, Aida Fuentes, the defendant's "common-law" wife, testified defendant was not at home earlier on the evening of the shooting, but that he arrived home at approximately 10:15 p.m. The address of their home that Ms. Fuentes provided on direct examination was 231 Clemson, Apartment C in Kenner. On cross-examination, Ms. Fuentes stated she had made a mistake and that they were actually on Baylor Street at the time of the shooting. When confronted with the difference in the two addresses, Ms. Fuentes explained that she was nervous at the beginning of her testimony when she said they were living at the Clemson address.
Ms. Fuentes said that the overalls seized from her residence belonged to her sister, Julia Aguilar, who was staying with them at the time. Further, Ms. Fuentes stated that the cross that was seized was actually at the jewelry shop on August 31, 1997. Ms. Fuentes claimed that she picked up the cross on the following day, September 1, 1997. Both Ms. Fuentes and Julia Fuentes Aguilar stated that Serrano wore his hair in a pony tail, but defendant never had.
Ms. Aguilar said that the overalls belonged to her, not the defendant, and that the defendant came home later that evening, but she was not certain of the time. Further, Ms. Aguilar claimed that the defendant had borrowed her light-blue Toyota Tercel that night. Arecio Conde, who lived across the street from Ms. Fuentes' parents, confirmed in his testimony that the defendant wore his hair short in the back.

ASSIGNMENT OF ERROR NUMBER ONE
The Defendant argues that the District Court denied him his right to present a defense, his right to compulsory process, *116 and his right to due process when, at 8 pm, following 10½ hours of trial proceedings, the trial court refused to adjourn for the day to enable the defendant to re-secure the presence of a subpoenaed witness whose testimony was critically vital to the defense. The defendant specifically contends that his right to present a defense was abridged because the trial judge refused to grant his motion for recess to secure the presence of Ted St. Amant. Defendant asserts that Mr. St. Amant, a jeweler, would have said that the crucifix identified as the one worn by the shooter was at his jewelry shop on the night of the murder.
On September 29, 1999, the defense presented the testimony of ten witnesses, including Aida Fuentes, defendant's common-law wife. Ms. Fuentes, testified that the crucifix, that was seized from her home and identified as the one worn by the perpetrator, was at Mr. St. Amant's jewelry shop for repairs on the night of the murder, August 31. According to Ms. Fuentes, the crucifix was at the shop for approximately a week before August 31, and she picked it up on September 1. During her testimony, Ms. Fuentes noted that Mr. St. Amant had been in the hall.
After Ms. Fuentes, the defense called two other witnesses, Julia Fuentes and Arecio Conde. The trial day ended at 8:45 p.m. On the next day, September 30, the defense notified the trial judge sometime after the lunch break that Mr. St. Amant was not at court. At a bench conference, Mr. Regan, the defendant's attorney, told the trial judge that Mr. St. Amant had been given an "in-court subpoena, an in-court notice" on the previous day. Mr. Regan said that he had just spoken with Mr. St. Amant by telephone, and that Mr. St. Amant had expressed reluctance to return to court, but said that he was on his way. The prosecutor's told the judge that Mr. St. Amant was among the witnesses that the defense had "sent home." Thereafter, the court responded that it would wait a reasonable time for Mr. St. Amant to show up since he was under subpoena, had been given a notice by the clerk to return, and was on his way.
The court then took a break to attend to other business unrelated to the trial. At the end of the break, Mr. Regan told the court that Mr. St. Amant had still not arrived. One of the other defense attorneys, Mr. Ehle, told the court that Mr. St. Amant said that it would take approximately 45 minutes for him to reach the courthouse from Chalmette. According to Mr. Ehle, it was then 45 minutes from when Mr. St. Amant said he was departing Chalmette. The court declared a recess upon the defense's request to contact Mr. St. Amant.
After the recess, Mr. Ehle informed the court that Mr. St. Amant had come to court "voluntarily" the previous day at approximately 1:30 p.m., but was served with an in-court subpoena at that time. Mr. Ehle stated that he spoke to Mr. St. Amant's wife within the past two hours, and that Mrs. St. Amant indicated that Mr. St. Amant was not coming to court. Mr. Ehle then moved for a recess for the court to compel Mr. St. Amants presence. According to Mr. Regan, Mr. St. Amant would testify that the crucifix was at his shop on the weekend of the murder, and that he had altered the crucifix, making it impossible for it to have been worn by the shooter. Mr. Regan emphasized that this testimony was essential, since it would seriously undermine the eyewitness' testimony.
Thereafter, the prosecutor, Mr. Wolff, told the court that he had just spoken with Mr. St. Amant by telephone moments before. Mr. St. Amant told Mr. Wolff that he had been asked to voluntarily come to *117 court the day before and that he knew nothing about the case. Mr. St. Amant further told Mr. Wolff that Aida Fuentes had once worked in his store and the only piece of jewelry he recalled working on for her was a cross she was wearing around her neck the day before in court.
Mr. Ehle responded that Mr. St. Amant's different story to the prosecutor was motivated by his desire not to come to court. The prosecutor then reiterated that the defense had ample time to call Mr. St. Amant as a witness. Further, the prosecutor questioned whether Mr. St. Amant had even been subpoenaed, since Mr. St. Amant said he had come to court "voluntarily." Mr. Regan responded that it was not an issue and based on the testimony of Aida Fuentes, the testimony of Mr. St. Amant was critical, probative evidence that should be presented.
At the conclusion of the discussion, the court denied the defense's request to recess stating that it was clear the defense had an opportunity to present the witness, he was not presented and he had indicated he was not going to appear.
Both the Sixth Amendment of the United States Constitution and Article I, Section 16 of the Louisiana Constitution (1974) guarantee a criminal defendant the right to compulsory process and to present a defense. A defendant's right to compulsory process is the right to demand subpoenas for witnesses and the right to have those subpoenas served. State v. Gordon, 01-734 (La.App. 5 Cir. 11/27/01), 803 So.2d 131, 148.
Pursuant to LSA-C.Cr.P. art. 709, a defendant must state the following in order to be entitled to a continuance for securing the presence of a witness:
1) Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial;
2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred; and
3) Facts showing due diligence used in an effort to procure attendance of the witness.
A motion for recess is evaluated by the same standards as a motion for a continuance. State v. Warren, 437 So.2d 836 (La.1983); State v. Hodges, 98-0513 (La.App. 4 Cir. 12/2/99), 749 So.2d 732, 739. The decision to grant a recess lies within the discretion of the trial court and will not be overturned absent an abuse of that discretion. State v. Hampton, 98-0331 (La.4/23/99), 750 So.2d 867, 877, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999); State v. Stevenson, 02-0079 (La.App. 5 Cir. 4/30/02), 817 So.2d 343, 345.
Defendant cites State v. Calloway, 97-796 (La.App. 5 Cir. 8/25/98), 718 So.2d 559, 568, writs denied, 98-2435, 98-2438 (La.1/8/99), 734 So.2d 1229, which reversed the defendant's murder convictions because the defendant's right to present a defense was "adversely limited" when the trial court refused to allow the defendant to present the testimony of alibi witnesses. In Calloway, the defendant had his witnesses available to testify that morning, but the State did not finish its case until after 4:00 p.m. By that time, the defense witnesses were not present. The defense was given the choice of putting the defendant on the stand that evening, or waiving its right to call him as a witness. Under those circumstances, the defense struck a compromise that, if the trial court recessed for the night, the defense would only call the defendant the next day. However, on the following morning, the defense announced that it had several of the witnesses *118 available to testify and requested permission to call them to the stand. The Calloway court concluded that, under these circumstances, the defendant was deprived of his right to present a defense. Id. at 566-569.
Calloway is distinguishable from the present case for many reasons. In Calloway, the defense could not call its witnesses earlier, since the State was still presenting its case. In this case, however, the defense could have called Mr. St. Amant when he appeared, but chose to call other witnesses instead. Further, Calloway had his witnesses ready to testify the next morning, while the defendant in this case did not. Thus, Calloway is not applicable to the present case.
Turning to the criteria in LSA-C.Cr.P. art. 709, it is questionable whether the defense satisfied any of those requirements. Although the defense related Mr. St. Amant would have testified that the crucifix was at his shop on the night of the murder, the assistant district attorney indicated that Mr. St. Amant would not have testified as the defense asserted. Thus, we find that the defendant failed to satisfy the first prong of Article 709.
It is also unclear that the defendant made the required showing that Mr. St. Amant would be available to testify in future if the court had granted a recess. The defendant requested the court issue an attachment and send the sheriff out to Mr. St. Amant's home. However, Mr. St. Amant could only have been attached if he had received a subpoena, which is addressed below.
Additionally, it is questionable that the defense satisfied the "due diligence" requirement of Article 709. The record shows that Mr. St. Amant was in the hall waiting to testify while the defense called many other witnesses. The record also indicates that the defense did not notify the court of Mr. St. Amants absence until lunchtime the next day, after the defendant had testified all morning.
Further, the record does not clearly establish that the defense subpoenaed Mr. St. Amant. Although Mr. Ehle, one of the defendant's attorneys, told the court that "Kelly" gave Mr. St. Amant an "in-court subpoena," he qualified the statement by saying that Mr. St. Amant had been given an "in-court notice." And, the court's minutes for September 29, 1999 do not indicate that an instanter subpoena was issued for Mr. St. Amant.
The Louisiana Supreme Court has held that, as a general rule, the "due diligence" requirement of Article 709 is not satisfied when defense counsel fails to have the potential witness subpoenaed. State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832, 858; State v. Terry, 359 So.2d 172, 173 (La.1978). In State v. Snyder, supra, the Louisiana Supreme Court found no abuse in the trial courts discretion in denying a motion to continue the penalty phase of a death case due to the absence of a defense witness. In Snyder, the court stated that "[t]he record contains no evidence that Dr. Salzer was ever subpoenaed or that defendant attempted to obtain her presence in any way." The Snyder court emphasized that the defense had not contradicted the States assertion that the witness had ever been subpoenaed. State v. Snyder, 750 So.2d at 858.
Further, Mr. Regan did not contradict the prosecutor when he questioned whether the witness had even been subpoenaed.
As in the foregoing cases, we find that the defendant did not demonstrate due diligence in securing Mr. St. Amant as a witness. The trial judge had twice recessed upon the defendant's request before denying the motion to recess for the day. Further, the judge's reasons for denying *119 the recess reflect that he was familiar with the situation, that it was clear the defense did not take advantage of the opportunity to call Mr. St. Amant, and that Mr. St. Amant indicated he was not coming to court. The Louisiana Supreme Court has stated that it "has demonstrated a noticeable reluctance to reverse in Article 709 cases absent a clear showing of abuse on the part of the trial judge." State v. Atkins, 360 So.2d 1341, 1348, fn. 3 (La.1978). Under the circumstances, we find that the trial judge did not abuse his discretion in denying the defendant's motion to recess for the day to secure Mr. St. Amant's presence.

ASSIGNMENT OF ERROR NUMBER TWO
The defendant asserts that the district court erred in admitting the notice of alibi prepared by defense counsel as evidence of a prior inconsistent statement of the defendant, used by the prosecutor for impeachment. Specifically, defendant contends the document was not proper impeachment material because the notice was a statement made by his attorney, not by him. Further, defendant contends that the trial judge should have granted his mistrial motion made on this basis.
LSA-C.Cr.P. art. 727 establishes the formalities for the defendant's notice of alibi and provides in pertinent part:
A. Upon written demand of the district attorney stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten days, or at such different time as the court may direct, upon the district attorney a written notice of his intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi.
The article also imposes a reciprocal burden upon the State to notify the defendant in writing of the "witnesses upon whom the state intend's to rely to establish the defendant's presence at the scene of the alleged offense and any other witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses." LSA-C.Cr.P. art. 727B. Paragraph F prohibits the admission of a notice of alibi that is later withdrawn as follows:
Evidence of an intention to rely upon an alibi defense, later withdrawn, or of statements made in connection with such intention, is not admissible in any civil or criminal proceeding against the person who gave notice of the intention.
Pursuant to the State's demand, the defense filed its notice of alibi, which provides in pertinent part:
NOW INTO COURT comes MARTIN E. REGAN, JR., attorney for LUIS RODGRIGUES [sic], who advises this Court in writing, after advising this Court orally, that his client will maintain that he was at 3221 Dartmouth Drive, Kenner, Louisiana 70065 on August 31, 1997. With him were Jaclyn Hotard, Felicia Fuentes, Aida Fuentes and Trina Ruiz.
The notice was then signed by Mr. Regan and filed in the district court record on October 7, 1998, approximately one year before trial. The notice was not subsequently withdrawn.
During his testimony, defendant said he was at the bowling alley earlier in the evening, but arrived home around 10:00 or 10:15 p.m. Defendant stated that the address of his home was 251 Baylor Street. On cross-examination, the defendant replied negatively when the prosecutor *120 asked defendant if he had ever told anyone that he had been anywhere but the Baylor address at the time of the murder. Defendant acknowledged that both he and Aida had told his attorneys that he was at his home on Baylor Street. As the prosecutor approached the defendant to question him about the notice of alibi, the defense objected. At a bench conference, defense counsel, Mr. Regan, explained that the address on the notice of alibi was a mistake and argued that the document could not be used to impeach the defendant's testimony because the document was not prepared by the defendant himself. The State responded that the document was prepared by the defendant's attorney on behalf of the defendant and filed into the court's record and, therefore, should be attributed to the defendant. After further discussion, the trial judge overruled the defendant's objection and motion for mistrial.
The prosecutor then showed the document to the defendant, who stated that the address on the notice of alibi was Aida Fuente's grandmother's residence. Defendant denied that he ever told his attorneys he was at the address at the time of the offense. Defendant acknowledged that he had said he was in the presence of three of the four individuals listed on the notice, but denied that he knew the fourth person, "Felicia Fuentes." Defendant reiterated that he told his attorneys, and that he had consistently maintained, he was at his own home on Baylor Street.
After cross-examination, the prosecutor moved to have the document admitted into evidence. In response, Mr. Regan stated that "we have absolutely no objection, but some cross-examination to explain the document would be appropriate." The document was then admitted. On redirect examination, the defendant denied that he had reviewed the notice of alibi before Mr. Regan filed it. Further, defendant reiterated that his attorneys must have mistakenly used Aida's grandmother's address, instead of his own home address. Defendant emphatically denied he had told his attorneys that he was anywhere but his home at the time of the murder.
Although the defense initially moved for a mistrial, it appears that the defense abandoned the mistrial motion when Mr. Regan said he had "absolutely no objection" to the document's admission. In State v. Alexis, 98-1145 (La.App. 5 Cir. 6/1/99), 738 So.2d 57, 69, this Court held that the defendant had abandoned his mistrial motion when he later acquiesced in a remedy other than the requested mistrial. Similarly, it appears that the defense abandoned the mistrial motion in favor of having the defendant explain the alleged discrepancies in the notice of alibi on redirect examination.
Defendant contends that reversal is warranted based on People v. Taylor, 296 A.D.2d 512, 745 N.Y.S.2d 477 (2002), which found that the court improperly permitted the prosecutor to cross-examine the defendant about his alibi notice as follows:
The trial court erred in allowing the prosecution to repeatedly cross-examine the defendant regarding information contained in his notice of alibi, since that notice did not contain any statements made by the defendant and was merely a document prepared by defense counsel pursuant to statute (see CPL 250.20; People v. Nelu, 157 A.D.2d 864, 550 N.Y.S.2d 905).
However, the remainder of the case, quoted below, deals with prosecutorial remarks:
While many of the defendant's objections regarding comments made by the prosecution during summation were not properly preserved for appellate review, under the circumstances of this case we will nonetheless review the subject *121 claims in the exercise of our interest of justice jurisdiction (see CPL 470.15[6][a]).
Here, the challenged remarks made by the prosecution during summation constituted reversible error, as the remarks exceeded the "broad bounds of rhetorical comment permissible in closing argument" (People v. Galloway, 54 N.Y.2d 396, 399, 446 N.Y.S.2d 9, 430 N.E.2d 885 [1981]) to the extent that the prosecution distorted the facts in evidence and made comments which were either inflammatory, speculative, or concerned matters not in evidence (see People v. Ashwal, 39 N.Y.2d 105, 383 N.Y.S.2d 204, 347 N.E.2d 564 [1976]).
The prosecution consistently disregarded the Supreme Court's sustained objections by continuing its line of improper questioning during cross-examination (see People v. Stewart, 92 A.D.2d 226, 459 N.Y.S.2d 853 [1983]). Accordingly, a new trial is ordered.
In light of our determination, we need not address the defendant's remaining contention.
We decline to follow Taylor because it does not provide any foundation for its conclusory statement regarding the impropriety of cross-examining defendant about information in the notice of alibi. Further, we will not rely on Taylor, since the case does not clearly state that the decision to reverse was based on the prosecutor's cross-examination of the defendant. Rather, most of Taylor deals with the prosecutor's improper remarks, not the questions about the alibi notice.
Additionally, Taylor is distinguishable by the differences in the Louisiana and New York statutes dealing with alibi notice. As stated above, LSA-C.Cr.P. art. 727F specifically forbids the admission of any evidence of an intent to rely upon an alibi when the alibi is subsequently withdrawn.
We find that there is no trial court ruling before this Court for review, since the defense specifically stated it did not object to the admission of the notice of alibi.

ASSIGNMENT OF ERROR NUMBER THREE
Defendant next argues that the district court denied him his right to counsel by ordering him and his attorneys to have no contact with each other for any reason whatsoever during a one hour and forty minute lunch recess. By this assignment, the defendant contends that his Sixth Amendment right to the assistance of counsel was violated.
During the State's cross-examination of the defendant, the jury indicated that it needed a break. At that point, the trial judge decided to recess for lunch, since food had already been ordered for the jury. After the jury left, the prosecutor requested that the trial judge "order no contact between the witness and his lawyers during the lunch break." Defense counsel strenuously objected. Thereafter, the following colloquy occurred:
THE COURT:
Mr. Regan and Mr. Ehle, I don't want either one of you to have any contact with this Defendant, while he's under oath testifying during this lunch break. If he needs to contact his attorney for some other reason, he can communicate that to the Court, and the Court will handle it.
MR. REGAN [defense counsel]:
Why would he contact me?
THE COURT:
I don't know why he wants tohow would I know why he wants to contact you?
*122 MR. REGAN:
Precisely, that's why I want to make sure the record is clear, in light of the case law on this point.
THE COURT:
It's extremely clear, if you would listen. You would hear what I told you, and I will make it clear to him that he can contact you through the Court during this break, if he feels it necessary to do so.
MR. REGAN:
Okay, would you advise him of that? Why would he want to?
THE COURT:
I don't know why he would want to.
MR. REGAN:
You're going to advise him of that, at this point, that if he requests to talk to me, he can do it, and he'll tell you?
THE COURT:
He's going to come over here and I'm going to be here, and we're going toI'm going to find you want he wants to talk to you about. Youre not going to talk about his testimony, I'll guarantee you that.
MR. REGAN:
Well, all I'm saying is: Not an objection, at this point. I haven't heard your instruction to him yet, so, I don't know what the instructions will be to him, and then ultimately, should he request to talk to me, I would object to the Court being present for that attorney/client discussion because he is the Defendant, at this point.
THE COURT:
Well, I'll tell you what: We'll make it easy. He doesn't't get to talk to you, all right. That will make is [sic] simple.
Thereafter, the defense moved for a mistrial, which the trial judge denied.
In Geders v. United States, 425 U.S. 80, 82, 91, 96 S.Ct. 1330, 47 L.Ed.2d 592, (1976), the United States Supreme Court reversed defendant's conviction, holding that the defendant was deprived of the assistance of counsel in violation of the Sixth Amendment because the trial court prohibited him from consulting with his attorney during an overnight recess that occurred after direct, but before defendant's cross-examination. The Geders court expressly limited its holding as follows:
The challenged order prevented petitioner from consulting his attorney during a 17-hour overnight recess, when an accused would normally confer with counsel. We need not reach, and we do not deal with, limitations imposed in other circumstances. We hold that an order preventing petitioner from consulting his counsel "about anything" during a 17-hour overnight recess between his direct and cross-examination impinged upon his right to the assistance of counsel guaranteed by the Sixth Amendment.
Id., 96 S.Ct. at 1337.
In contrast, the Court declined to extend Geders to a 15-minute recess that occurred between the direct and cross-examination of the defendant in Perry v. Leeke, 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989). Although the Perry court recognized that the "line between the facts of Geders and the facts of this case is a thin one," the Court concluded that the trial judge's order prohibiting contact between defendant and his attorney during the brief recess did not deprive defendant of his constitutional right to the assistance of counsel. Id., 488 U.S. at 280, 109 S.Ct. 594. The Court explained the distinction between the two cases as follows:
The interruption in Geders was of a different character because the normal *123 consultation between attorney and client that occurs during an overnight recess would encompass matters that go beyond the content of the defendant's own testimonymatters that the defendant does have a constitutional right to discuss with his lawyer, such as the availability of other witnesses, trial tactics, or even the possibility of negotiating a plea bargain. It is the defendant's right to unrestricted access to his lawyer for advice on a variety of trial related matters that is controlling in the context of a long recess. See Geders v. United States, 425 U.S., at 88[, 96 S.Ct. 1330]. The fact that such discussions will inevitably include some consideration of the defendant's ongoing testimony does not compromise that basic right. But in a short recess in which it is appropriate to presume that nothing but the testimony will be discussed, the testifying defendant does not have a constitutional right to advice.

Id., 488 U.S. at 284, 109 S.Ct. 594. (Emphasis added).
According to Perry, the truth-seeking function of the trial is the reason for not interrupting the defendant's testimony to allow consultation with counsel:
Cross-examination often depends for its effectiveness on the ability of counsel to punch holes in a witness' testimony at just the right time, in just the right way. Permitting a witness, including a criminal defendant, to consult with counsel after direct examination but before cross-examination grants the witness an opportunity to regroup and regain a poise and sense of strategy that the unaided witness would not possess. This is true even if we assume no deceit on the part of the witness; it is simply an empirical predicate of our system of adversary rather than inquisitorial justice that cross-examination of a witness who is uncounselled between direct examination and cross-examination is more likely to lead to the discovery of truth than is cross-examination of a witness who is given time to pause and consult with his attorney.
Id., 488 U.S. at 282, 109 S.Ct. 594.
The Perry court further stated that the trial judge is not required to prohibit conversations between the defendant and his attorney during such "brief recesses," but explained that the "Federal Constitution does not compel every trial judge to allow the defendant to consult with his lawyer while his testimony is in progress if the judge decides that there is a good reason to interrupt the trial for a few minutes." Perry, 488 U.S. at 284-285, 109 S.Ct. 594.
The United States Supreme Court has not revisited this issue since Perry was decided in 1989. Louisiana state courts have only cited Perry once and Geders twice. Only one of these cases, State v. Martin, 508 So.2d 152, 155 (La.App. 4 Cir.1987), is relevant to this case. In Martin, the court held that the trial judge did not abuse his discretion in denying the defendant's request to speak with his attorney after cross-examination but before redirect examination. The Martin court distinguished Geders, reasoning that any recess would have been just for few minutes and that the only possible subject of the recess would have been the defendant's impending redirect examination. Id. at 155.
In People v. Enrique, 165 A.D.2d 13, 566 N.Y.S.2d 201 (1st Dep't 1991), affd at 80 N.Y.2d 869, 587 N.Y.S.2d 598, 600 N.E.2d 229 (1992), decided after Perry, the court considered a trial judge's order banning defendant's consultation with counsel during a lunch break. The Enrique court held that defendant's right to counsel was not violated by the trial court's order that *124 defendant could not confer with counsel during a 1 hour and 25 minute lunch recess that occurred in the course of defendant's cross-examination. After discussing Geders and Perry, the court concluded that Perry applied to the lunch recess at issue:
The facts of the present case fall between Perry and Geders, since the lunch recess, which lasted 1 hour and 40 minutes, is substantially shorter than the overnight recess in Geders, but longer than the 15 minute recess in Perry. The case is similar to Enrique, in that the lunch recess was approximately the same period of time and occurred during the defendant's cross-examination.
Here, the trial judge's order did not initially ban all consultation with counsel. The context of the judge's remarks seems to indicate that he would have permitted the defendant to consult his attorney during the break, had the defendant notified the trial judge of such a desire. Although defendant asserts on appeal that the lunch break was important because "it may have been the only significant opportunity for counsel and his client to discuss the defense, neither of the defendant's attorneys stated any matter that needed to be discussed with defendant during the lunch break." Accordingly, we find the case is more similar to Perry and Enrique than Geders. Therefore, we conclude that the trial judge's order was not an abuse of discretion.

ASSIGNMENT OF ERROR NUMBER FOUR
The defendant next argues that the court erred in refusing to allow the defense to ask Jorge Serrano, on redirect or as recalled witness, whether he had a pony tail at the time of the crime. The defendant contends that his right to present a defense was abridged.
The record reflects that the court allowed the defense to examine Serrano at length. In fact, direct examination alone encompassed approximately a day and a half, and the entirety of Serrano's testimony spans volumes eight, nine and ten of the appellate record. During the protracted direct examination, the defense did not ask Serrano about his hairstyle at the time of the shooting. It was only on redirect that the subject was addressed. The State objected on the basis that Serrano's hairstyle was beyond the scope of redirect examination, since the subject was not covered in cross-examination. Mr. Regan responded that he had neglected to inquire about Serrano's hairstyle during direct. The court sustained the State's objection, and denied the defendant's motion for a mistrial. At the conclusion of redirect, the defense moved to recall Serrano for the purpose of inquiring into his hairstyle. The State objected on the basis that recalling Serrano could raise additional issues, which would entitle the State to recross Serrano and would unduly prolong the trial. The trial judge sustained the State's objection and denied defendant's mistrial motion. The defense then proffered Serrano's testimony, in which Serrano stated that he wore his hair in a pony tail at the time of the shooting.
The scope of redirect examination of a witness is governed by LSA-C.E. art. 611D, which states:
A witness who has been cross-examined is subject to redirect examination as to matters covered on cross-examination and, in the discretion of the court, as to other matters in the case. When the court has allowed a party to bring out new matter on redirect, the other parties shall be provided an opportunity to recross on such matters.
In the present case, the prosecutor did not ask Serrano any questions about his *125 hairstyle on cross-examination. Therefore, the questions about his hairstyle were not technically within the scope of redirect examination.
Defendant alternatively contends that the trial judge abused his discretion in refusing to permit the defense to recall Serrano to inquire about Serrano's hairstyle. Although the trial judge has discretion to allow a party to recall a witness after the witness has been dismissed, the trial court may deny permission to recall a witness if it will cause undue delay and if the facts show that the party had a reasonable opportunity on the witness' first appearance to question the witness about the matter for which recall is sought. State v. Griffin, 288 So.2d 636, 638 (La.1974).
The defendant relies on State v. Davis, 498 So.2d 723 (La.1986), which held that the trial judge abused his discretion by refusing to permit the defense to recall the victim. In Davis, the key issue was identification of the defendant as the perpetrator of a robbery. During cross-examination, the victim denied that she told anyone that she had not seen the robber's face. Other defense witnesses, however, testified to the contrary. When another witness was asked to relate the details of what the victim had said, the trial judge interrupted, though the prosecution had not objected, and stated no foundation had been laid to impeach the victim. The trial judge denied the defendant's motion to recall the victim to lay the proper foundation. Id. at 725.
The Louisiana Supreme Court concluded that the trial judge's ruling was an abuse of discretion because the evidence was relevant and recalling the victim would not have consumed a great deal of time. The Davis court observed that virtually all of the State's case rested on the strength of the victim's identification, and the evidence would have served to undermine the victim's identification of defendant as the perpetrator. Therefore, the Davis court held that the exclusion of this evidence infringed on the defendant's right to present a defense. State v. Davis, 498 So.2d at 726.
The facts in this case are distinguishable from Davis because the jury was not deprived of the information that the defense sought to elicit from Serrano on redirect or by recalling him. Both defendant and Aida Fuentes testified that Serrano wore his hair in a pony tail, but that defendant never had a pony tail. Rather, defendant described his own hairstyle at the time he was arrested as a "poopy-doo," which is shaved all of the way around the head with more hair on top.
By the time that the defense sought to ask the questions on redirect, the trial was in its seventh day. The defense had the entire sixth day, and one half of the seventh day to ask Serrano this question. The trial judge's comments indicate he was concerned that recalling Serrano or permitting these questions on redirect, would be unduly time consuming. The trial court is vested with much discretion in controlling the scope of redirect examination, and those rulings are not to be disturbed on appeal absent an abuse of that discretion. State v. Wright, 593 So.2d 759, 764 (La. App. 5 Cir.1992). Considering the length of the trial, the length of Serrano's testimony, and the fact that the defense had an ample opportunity to develop the testimony regarding the hairstyle on direct, it appears that the trial judge was within his discretion to refuse the defense requests.
In addition, for an error to be predicated on a ruling excluding evidence, LSA-C.E. art. 103A(2) requires that a substantial right of a party be affected and that counsel inform the trial court of the substance of the excluded evidence. State *126 v. Joseph, 01-360 (La.App. 5 Cir. 10/17/01), 802 So.2d 735, 745; State v. Batiste, 96-1010 (La.App. 5 Cir. 1/27/98), 708 So.2d 764, 769, writ denied, 98-0913 (La.9/4/98), 723 So.2d 954. In this case, the defendant's substantial rights were not affected by the exclusion of this evidence from Serrano, since the jury heard the same testimony from defendant and Ms. Fuentes. Further, when the prosecutor asked Clark and Craig whether it would alter their identification testimony if it turned out the defendant did not have a pony tail, they answered negatively. Most importantly, all four of the eyewitnesses said that Serrano did not resemble the defendant. Accordingly, even if the trial judge's ruling was improper, the error was harmless.

ASSIGNMENT OF ERROR NUMBER FIVE
The defendant argues that the district court erred in denying his request for a mistrial when the prosecutor referred to inadmissible evidence of an anonymous tip identifying the defendant as the perpetrator of the crime. The defendant contends that the trial judge improperly denied his motion for a mistrial on the basis that the prosecutor referred to a hearsay statement that prompted the police to focus on the defendant as the perpetrator.
During opening statement, the prosecutor said that, on the night after the shooting, "Detective Tommy Powell, who was the lead detective on the case, got a lead. You know, there are different ways that the police get leads, ... but he got a lead from a concerned citizen." Defendant objected on the basis the statement was hearsay and moved for a mistrial. At a bench conference, the prosecutor argued that the reference was not hearsay, since it was merely background to the officer's investigation. After the bench conference, the trial judge denied the mistrial motion, finding that the reference was not "improper."
The next day, defendant re-urged his mistrial motion, but the trial court again denied the motion as well as defendant's request for an admonition. When Detective Powell testified, he acknowledged he had received a lead and said that he compiled a photographic lineup. However, the officer did not refer to the source of the lead.
The scope of the State's opening argument is prescribed in LSA-C.Cr.P. art. 766, which provides that it "shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge." Although the above article does not provide a sanction if the prosecutor's statement exceeds permissible grounds, LSA-C.Cr.P. arts. 770 and 771 do provide remedies for improper statements made by the prosecutor. In the present case, the remark was not within the scope of LSA-C.Cr.P. art. 770; thus, LSA-C.Cr.P. art. 771 applies instead and provides as follows:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark *127 or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
In the present case, the issue is whether the prosecutor's remarks constituted references to inadmissible hearsay. Hearsay is an oral or written assertion, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. LSA-C.E. arts. 801A(1) and 801C. Hearsay evidence is not admissible except as otherwise provided by the Code of Evidence or other legislation. LSA-C.E. art. 802; State v. Soler, 93-1042 (La.App. 5 Cir. 4/26/94), 636 So.2d 1069, 1078, writ denied, 94-1361 (La.11/4/94), 644 So.2d 1055.
Under certain circumstances, the testimony of a police officer may include information provided by another individual without constituting hearsay if it is offered to explain the police investigation and the steps leading to the defendant's arrest. State v. Hawkins, 96-0766 (La.1/14/97), 688 So.2d 473, 477. However, the fact that an officer acted on information obtained from an informant may be relevant to explain his conduct, but that information cannot be used as a passkey to bring before the jury the substance of the out-of-court assertion that would otherwise be barred by the hearsay rule. State v. Hawkins, 688 So.2d at 477-478; State v. Wille, 559 So.2d 1321, 1331 (La.1990).
In State v. Hawkins, supra, the Court held that an officer's testimony that he had received information from "another anonymous call that stated there were several individuals in the car with the perpetrator, Mr. Hawkins" contained impermissible hearsay as well as non-hearsay information. Id. at 477-478. The Hawkins court found that the first part of the statement was permissible because it explained the steps taken during the investigation. However, the Louisiana Supreme Court concluded that the part of the officer's statement identifying defendant as the perpetrator was inadmissible hearsay, but found that the error was harmless. Id. at 478.
In State v. Broadway, 96-2659 (La.10/19/99), 753 So.2d 801, 806-807, 810, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000), the Louisiana Supreme Court held that testimony from two police officers implicating defendant as a participant in the murder was inadmissible hearsay. The Broadway court further recognized that the prosecutor's remarks emphasizing that testimony in closing argument was prejudicial. Id. at 806, n. 2. However, the Broadway court concluded that the error was harmless in light of the eyewitness identification testimony, as well as the testimony of a co-perpetrator. Id. at 818.
In the present case, it appears that the remarks by the prosecutor did not refer to inadmissible hearsay. Rather, the remarks were made in the context of the sequence of the police investigation. Most importantly, however, the prosecutor's statement did not implicate the defendant in the offense. As such, the remarks are most similar to the permissible part of the statement made by the police officer in Hawkins. Even if the prosecutor's remarks were references to impermissible hearsay, it appears that the defendant was not prejudiced, since reference did not include the defendant's name and Detective Powell did not restate the prosecutors remark. It is further noted that the trial court's jury charge included an instruction that opening and closing statements were not to be considered as evidence.
*128 A mistrial is a drastic remedy and should only be granted where the defendant suffers such substantial prejudice that he has been deprived of any reasonable expectation of a fair trial. State v. Harris, XXXX-XXXX (La.2/26/02), 812 So.2d 612, 617. In this case, the defendant did not suffer such prejudice by the remark that a mistrial was warranted. Accordingly, we find that the trial judge did not abuse his discretion when denying the mistrial motion.

ASSIGNMENT OF ERROR NUMBER SIX
The defendant argues that the district court erred in refusing to declare Jorge Serrano a hostile witness. By this assignment, the defendant contends that his right to present a defense was abridged because the trial judge refused to declare Jorge Serrano a hostile witness.
On direct examination, the court sustained the State's objections to the defense attempting to ask Serrano leading questions. Serrano refused to say who had driven him home from the crime scene. Serrano explained that he did not wish to involve this individual in the current proceedings. Although the court repeatedly ordered Serrano to answer these questions, Serrano consistently refused to do so. The court even permitted the defense to have an ex parte conference in chambers so that the defense could discuss this issue. The court indicated that there was nothing short of holding Serrano in contempt to compel him to answer the questions. The defense declined to make a motion for Serrano to be held in contempt, however.
When the trial resumed, Serrano was informed by his attorney and the court that the judge had told Linda Davis-Short, Serrano's attorney, that she should advise Serrano of the penalties for contempt that could be imposed for failing to answer the question as ordered by the court. Still, Serrano said that he would not reveal the name of the individual who had driven him from the crime scene. Thereafter, the defense moved to strike his testimony, which was denied.
Likewise, Serrano would not reveal the identity of the person who had driven him to Miami. The court specifically directed him to answer the question, but Serrano adamantly refused to name the person. The defense again moved to strike Serrano's testimony, which was denied. The defense then moved for a mistrial because the trial judge denied his motion to strike Serrano's testimony.
Throughout Serrano's testimony, the defense argued that Serrano was a hostile witness. The defense stated that it was necessary for Serrano to be declared hostile so that the defense could ask Serrano leading questions. However, the court found that Serrano's and the defendant's interests coincided, since Serrano claimed that he had committed the murder. On redirect examination, defendant moved for mistrial because the court would not declare Serrano hostile.
LSA-C.E. art. 611C governs leading questions as follows:
C. Leading questions. Generally, leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony and in examining an expert witness on his opinions and inferences. However, when a party calls a hostile witness, a witness who is unable or unwilling to respond to proper questioning, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions. Generally, leading questions should be permitted on cross-examination. However, the court ordinarily shall prohibit counsel *129 for a party from using leading questions when that party or a person identified with him is examined by his counsel, even when the party or a person identified with him has been called as a witness by another party and tendered for cross-examination.
In State v. Jackson, 419 So.2d 425 (La.1981), the Louisiana Supreme Court explained that "[a] leading question is one which suggests to the witness the answer he is to deliver, and though framed in the alternative, is inadmissible when propounded to one's own witness, unless such witness is unwilling or hostile." The use of leading questions is largely within the discretion of the trial court, and only a clear abuse of discretion which prejudices the defendant's rights will justify the reversal of a conviction. State v. LeBlanc, 618 So.2d 949, 960 (La.App. 1 Cir.1993).
In the present case, the defendant was not prejudiced by the trial judge's refusal to permit the defense to lead Serrano. There is no indication that Serrano would have answered the questions any differently had the defense been permitted to ask leading questions. Even though the State could ask leading questions on cross-examination, it fared no better than the defense. Serrano simply refused to name the individuals who drove him from the crime scene and who drove him to Miami. As such, the trial judge did not abuse his discretion in refusing to declare Serrano a hostile witness.

ASSIGNMENT OF ERROR NUMBER SEVEN
The defendant argues that the court erred in denying his motion for a new trial after refusing to permit a defense inquiry into the content of prejudicial newspaper articles to which nearly every juror had been exposed and by allowing the state to validate the verdict through an inquiry into each juror's mental deliberative process.
The defendant filed a motion for new trial based on jury misconduct. In this assignment, the defendant contends that he did not receive a fair hearing on his new trial motion at which several jurors testified because the trial judge sustained the State's objections to jurors' relating what other jurors had said about newspaper articles they had read during the trial. Defendant further asserts that the hearing was not fair because the trial judge permitted the State to ask each juror whether they had been influenced by the newspaper articles. Accordingly, defendant argues that he is entitled to a new hearing on the motion.
After the trial, Ms. Angie Gobert, the sole juror who voted not guilty, wrote a letter to the judge, which she also sent to the State and defense. Ms. Gobert expressed her belief that the other jurors had not behaved appropriately for a number of reasons, including that some jurors did not follow the judge's instructions with regard to not discussing the case before deliberations, that some jurors had discussed newspaper articles about the trial, and that some jurors had talked about the case with non-jurors. The defense filed a motion for new trial based on the basis that the verdict was contrary to the law and evidence and based on irregularities in the trial. Ms. Gobert's letter was attached to the motion. The State filed a memorandum in opposition to a hearing.
Subsequently, the State filed a memorandum on the scope of any evidentiary hearing. The defendant filed a supplemental motion for new trial, specifying seven allegations of jury misconduct based on Ms. Gobert's letter:
(1) Juror discussion of newspaper articles related to the trial.
*130 (2) Juror discussion of conversations with persons not on the jury.
(3) Derogatory and offensive racial characterizations of the defendant.
(4) Feigned deliberation.
(5) Consideration of facts unrelated to the case and not in evidence.
(6) Sleeping during testimony.
(7) Casting doubt on critical defense testimony by stating it was improperly translated.
The judge held a hearing on January 6, 2000. After argument from both the State and the defense, the trial judge ruled that allegations three through seven did not warrant taking testimony from the jurors. The defendant does not challenge that ruling on appeal.
As to the first allegation, the defense informed the court that it wished to present testimony from Ms. Gobert on the issue of a newspaper article that recounted an altercation between Mr. Bates, the assistant district attorney, and Mr. Ehle, one of the defendant's attorneys. According to the defense, this newspaper article was an outside influence that prejudiced the jury.
Thereafter, the court ruled as follows with regard to allegation number one:
All right. If in fact, they violated the Courts rule, the court finds that based upon the memos presented, the motion presented, and argument of Counsel, that there has been nothing before this Court which would indicate that there was any prejudice to Mr. Rodriguez with regard to thoseor to that particular newspaper article.
I recall that incident very clearly, gentlemen, and I certainly also recall the newspaper article. And if anybody was prejudiced, it might be the State. And I think Mr. Bates was quite embarrassed by the newspaper article, because the newspaper article made him look like the bad guy, or the aggressor in that particular article.
In any event, that has no reflection upon the facts of this case, of whether or not Mr. Rodriguez was guilty of the crime of second degree murder.
Now, let's move on to, then, Number 2, the conversations with persons not on the jury.
With regard to the second allegation, the court ruled that Ms. Gobert could testify whether she heard other jurors state that they had discussed the case with non-jurors. Further, the court ruled that if Ms. Gobert named those individuals, they would appear before the court to be questioned in that regard. The judge specifically stated that he was not interested in hearing the substance of those conversations, only the names of the parties involved. The defendant noted "an objection to any limitation placed on this procedure."
During Ms. Gobert's testimony, the court modified its ruling on the first issue:
And I think I'm going to go a little further with regard to the newspaper articles. I'll allow you to do the same thing with the newspaper articles. Whatever juror said they read newspaper articles, you know, I'm going to allow her to give those names, and I'll question those jurors whether or not they read any newspaper articles, and if so, whether it influenced their decision.
Ms. Gobert stated that one of the jurors, later identified through the jury's seating chart as Christopher Benoit, indicated that he had discussed the case with non-jurors. Ms. Gobert further stated that Mr. Benoit and another juror, Dora Seals, were discussing information that could only have been learned from the newspaper. The trial judge sustained the State's objection as to the substance of Mr. Benoit's remarks and ruled that Ms. Gobert could not *131 repeat any of Ms. Seals's or Mr. Benoit's remarks.
When the judge questioned Ms. Gobert, she stated that Mr. Benoit had related to some of the jurors the substance of his conversation with the non-juror. Additionally, Ms. Gobert told the court that Ms. Seals and Mr. Benoit related the contents of the newspaper article to other jurors.
After Ms. Gobert's testimony, the court ruled that the jurors identified by Ms. Gobert would be called to testify at another hearing regarding the newspaper articles and any outside conversations. Further, the court ruled that the rest of the jurors would be called to testify as well.
The next hearing occurred on February 17, 2000. The defendant rested on Ms. Gobert's testimony and the State called the foreman, William Parker. He stated that he read the newspaper for the first few days of the trial, but never saw anything related to the trial in the newspaper. One day, the bailiff saw him reading the newspaper in the jury room, and told Mr. Parker that he could not do so. Thereafter, Mr. Parker stated that his wife would remove all of the articles related to the trial from the newspaper before he read it. Mr. Parker said his wife saved the articles for him in a box to read after the trial.
Mr. Parker stated that one of the jurors mentioned that someone told them that the trial was in the newspaper, but the juror did not relate any details from the newspaper. According to Mr. Parker, another juror related that they had heard there was a confrontation between the attorneys in the courtroom after the jury had left. Mr. Parker could not recall which jurors had made these statements. Mr. Parker did not recall that any juror related "that someone had talked to them about the case." Mr. Parker testified that the confrontation between the attorneys was irrelevant to the verdict, and was forgotten the next day. According to Mr. Parker, the defendant was innocent at the start of the trial, but afterwards, Mr. Parker and ten other members of the jury believed he was guilty.
In rebuttal, the defense called as witnesses eight former jurors, Ms. Seals, Ms. Neyrey, Mr. Quigley, Ms. Smith, Mr. Carroll, Ms. Thompson, Ms. Posey, and Mr. Schexnayder. Ms. Seals denied that she had read the newspaper, stated that no juror mentioned any trial-related newspaper articles, and stated that she did not recall any of the former jurors relating information that they learned from a non-juror.
Ms. Neyrey testified that her mother called her one day and told her that there was an article in the newspaper regarding an altercation between the attorneys. Ms. Neyrey said she read that article. According to Ms. Neyrey, some of the jurors discussed the article, and the jurors thought the article was "funny." Ms. Neyrey stated that she remembers that the juror who was a mailman mentioned that he had talked to his wife, but the trial judge sustained the State's objection to the content of the remark.
Mr. Quigley acknowledged that he told the jurors that he had spoken to his wife about the case. According to Mr. Quigley, he merely related the events of the trial to his wife, whose only response was "Good night," because it was so late at night when he went home. Mr. Quigley said that the only thing he ever told the jury his wife said was, "Good night." Mr. Quigley acknowledged that he might have read newspaper articles that were related to the trial "two or three times" during the trial. But, Mr. Quigley testified that the articles contained "[e]xactly what was said in court."
*132 Ms. Smith stated that her former husband told her about the newspaper article regarding the altercation between the attorneys. Ms. Smith stated that the juror who was the mailman had said he read the newspaper, but that he did not recount the facts of what he had read to the jury. The trial court sustained the objection when the defense asked what the mailman said he had read.
Mr. Carroll testified that he overheard one of the jurors, who had just testified, say that he had read the newspaper "a couple of times." According to Mr. Carroll, that juror was in a conversation with another juror, but Mr. Carroll said he was not paying attention to the details of their conversation. Mr. Carroll stated that the same juror who had just testified brought up the newspaper article regarding the fight between the attorneys. Again, Mr. Carroll said he could not recall what was actually said, because he was preoccupied with other thoughts.
Ms. Thompson remembered that either one or two jurors had commented about the newspaper, but the trial judge sustained the State's objection when the defense inquired into the content of the remarks. Ms. Thomson also recalled that one of the jurors said he had talked to his wife about the case, but that the juror did not relate his wife's response.
Ms. Posey testified that one of the jurors had related the content of a newspaper article. According to Ms. Posey, the juror said "it was what we had talked about the day before, what went on the day before." Ms. Posey could not recall to which day of trial the article related. When the defense asked about the comment again, the trial judge sustained the State's objection made on the basis of relevance.
Mr. Schexnayder stated that he only recalled one juror, Mr. Quigley, who said that he had read the newspaper. Mr. Schexnayder said that Mr. Quigley did not relate the contents of what he read. According to Mr. Schexnayder, Mr. Quigley did not relate he had spoken to his wife about the case. When asked by the prosecutor whether any outside influences, including the newspaper, affected their verdicts, all of the foregoing jury members replied negatively. The defendant made no objection to this question.
After hearing argument, the trial court denied the motion for new trial as follows:
The purpose of the Court's orders to jurors not to discuss the case amongst themselves or with anyone else, and the instruction that they not read newspapers or view any other media reports with regard to the trial, is so that these jurors would reach a fair and impartial verdict based solely upon the evidence and the testimony presented at trial.
Although it's clear that some of the jurors did not strictly adhere to the Courts orders in that regard, the bottom line is whether or not their verdict was based upon some outside influence, whether or not it was based upon some prejudicial information that was improperly brought to their attention; each witness who testified in this matter has testified that their verdict was based upon the evidence presented at trial without any outside influence affecting their verdict.
The motion for a new trial is denied.
According to LSA-C.Cr.P. art. 851, "[t]he motion for a new trial is based on the supposition that injustice has been done to the defendant, and, unless such injustice is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded." Defendant's motion for new trial falls under *133 LSA-C.Cr.P. art. 851(4), which provides in pertinent part:
The court, on motion of the defendant, shall grant a new trial whenever:
. . . .
(4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment.
The denial of a motion for new trial is not subject to appellate review except for an error of law. LSA-C.Cr.P. art. 858. The ruling on a motion for a new trial is committed to the sound discretion of the trial judge and will be disturbed on appeal only when there is a clear showing of an abuse of that discretion. State v. McCorkle, 97-966 (La.App. 5 Cir. 2/25/98), 708 So.2d 1212, 1218. The merits of such a motion must be viewed with extreme caution in the interest of preserving the finality of judgments. State v. Pickrom, 31,987 (La.App. 2 Cir. 5/5/99), 732 So.2d 800, 813.
A juror who considers evidence not developed or admitted at trial violates his sworn duty and may be guilty of misconduct. State v. Graham, 422 So.2d 123, 131 (La.1982). In order for a defendant to obtain an evidentiary hearing based on juror misconduct, the defendant must make well-pleaded allegations that such misconduct violated his constitutional right to due process, to confront and cross-examine witnesses, or to a trial by a fair and impartial jury. Id. Upon receipt of this evidence, a new trial is warranted upon a showing that a constitutional violation occurred and that a reasonable possibility of prejudice exists. Id. The Graham court distinguished this rule from the "related precept which provides that in a criminal case, any unauthorized communication by a non-juror with a juror during trial or deliberation about the matter pending before him is deemed presumptively prejudicial." Remmer v. United States, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); State v. Bibb, 626 So.2d 913, 922 (La.App. 5 Cir.1993), writ denied, 93-3127, 642 So.2d 188 (La.9/16/94). The presumption is not conclusive, but the burden rests heavily upon the State to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to defendant. Id. Prejudice may be shown by evidence that an extrinsic factual matter tainted the jury's deliberations. State v. Bibb, supra. Thus, an adequate demonstration of extrinsic influence upon the jury overcomes the presumption of jury impartiality and shifts the burden to the State to show that the influence was not prejudicial. State v. Bibb, supra.
It is noted that the defendant does not contend that the trial judge improperly denied his motion on the merits, but rather the procedure employed by the court prevented him from obtaining a fair hearing. Specifically, defendant complains the trial court improperly prevented him from delving into the subject of the newspaper articles that at least Mr. Quigley and Ms. Neyrey read.
However, we find that the defendant did not preserve this issue for appeal because the defendant did not proffer the excluded testimony of any of the jurors he sought to question about the content of what they heard. In State v. Stevenson, 02-0079 (La. App. 5 Cir. 4/30/02), 817 So.2d 343, 347, this Court held that the defendant was precluded from raising the issue that the trial judge restricted his right of cross-examining a witness because the defendant failed to proffer the substance of the excluded testimony. In State v. Batiste, 708 *134 So.2d at 769, the defendant claimed he was deprived of the right to present a defense by the trial court's exclusion, as irrelevant, of a defense witness' testimony. This Court held that the defendant failed to preserve his claim for appellate review because the defense failed to proffer the substance of the excluded testimony.
As in the foregoing cases, the defendant objected, but failed to proffer the substance of the excluded testimony. Had defendant proffered their answers, the judge's ruling could have been easily evaluated. But, because the defendant failed to proffer the juror's answers, we conclude that the defendant failed to preserve the claim that the trial judge improperly prevented the jurors from relating the content of the discussions about the newspapers.
Defendant next contends that the trial judge deprived him of a fair hearing on his motion for new trial by allowing the prosecutor to inquire whether the newspaper articles affected their verdicts. However, the defendant did not object to any instance at the hearing when the prosecutor asked this question. The purpose behind the contemporaneous objection rule is to put the trial judge on notice of an alleged irregularity so that he may cure the problem, and to prevent the defendant from gambling on a favorable verdict and then resorting to appeal on errors that might easily have been corrected by an objection. LSA-C.Cr.P. art. 841; State v. Thomas, 427 So.2d 428, 433 (La.1982); State v. Snyder, 97-226 (La.App. 5 Cir. 9/30/97), 700 So.2d 1082, 1087. Since there was no objection to the questions by the prosecutor, we find that this issue has not been preserved for appellate review.

ASSIGNMENT OF ERROR NUMBER EIGHT
The defendant next argues that the pervasive prejudicial conduct of the prosecutors denied him a fair trial. The defendant contends that the prosecutors engaged in repeated misconduct that deprived him of the right to a fair trial. In his brief, defendant describes a number of instances of alleged prosecutorial misconduct. However, he also apparently abandoned these particular claims, because he states in his brief that:
[T]he Appellant does not rely on the foregoing for his claim for relief. Rather, he presents the foregoing to establish the proper context for the events described below, so that this Court will see that those events, taken with each other and with the foregoing, cumulated to render the trial of Luis Rodriguez so unfair that a retrial is necessary.
Accordingly, we will only address the instances of prosecutorial misconduct upon which defendant stakes his claim for relief. The defendant complains that the first prejudicial instance of misconduct occurred after the decedents mother, the State's first witness, stated her name, but said that she "would rather not give her address." Shortly thereafter, the prosecutor asked if "that courtesy [could] be extended to all of our lay witnesses on this case." The defendant then moved for a mistrial on the basis that the prosecutors remark implied that the witnesses were afraid of the defendant. The trial court denied the mistrial.
In State v. Simmons, 98-841 (La.App. 5 Cir. 6/1/99), 738 So.2d 1131, writ denied, 1999-2419 (La.4/20/00), 760 So.2d 333, the defendant complained that he was prejudiced by the prosecutors remark that the State had to keep one of its witnesses in jail to ensure his attendance at trial because the remark implied that the witness' life was in danger from the defendant. The Simmons court concluded that the remark, made during closing argument, was in response to the defendant's argument, *135 but also found that the remark was "not so prejudicial as to require reversal." Id. at 1140.
In the present case, the remark did not contain any implication that the witnesses were endangered by the defendant. Even if improper, LSA-C.Cr.P. art. 921 provides that "[a] judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused." Further, this Court has recognized that a defendant's conviction should not be reversed for errors unless the accused's substantial rights have been violated. State v. Winfrey, 97-427 (La. App. 5 Cir. 10/28/97), 703 So.2d 63, 71, writ denied, 98-0264 (La. 6/19/98), 719 So.2d 481. As stated above, a mistrial is a drastic remedy and should only be granted where the defendant suffers such substantial prejudice that he has been deprived of any reasonable expectation of a fair trial. State v. Harris, 812 So.2d at 617. As in Simmons, it does not appear that the remark, even if improper, was so prejudicial as to require reversal.
The defendant also complains that he was prejudiced by the prosecutor's derogatory reference to his attorney, Martin Regan. On Saturday, September 25, 1999, at approximately noon, the trial court held a hearing out of the presence of the jury at which the defendant testified that he heard one of the prosecutors, Richard Bates, refer to Mr. Regan as a "pussy." According to defendant, this remark was made while only defendant, the prosecutors, and courtroom deputies were in the courtroom. Further, defendant said that Mr. Bates told the defendant he could tell Mr. Regan that Bates had made that comment. Finally, defendant stated that he was already stressed by the trial, and that the encounter greatly increased his anxiety.
At the hearing, Mr. Bates admitted that he had said "Mr. Regan was responding to everything that was going on that he was a pussy." Mr. Bates explained that he had made the comment after becoming upset by a conference in the judge's chambers, during which the defense had cast aspersions upon the State's professionalism. According to Mr. Bates, the remark was made in the context of "question[ing] whether Mr. Regan was able to take everything that he dished out in his tactics and his approaches to things." Mr. Bates apologized to the defendant for "engaging" the defendant in the conversation, and expressed remorse for causing defendant any additional stress.
At the conclusion of the hearing, the defense requested an admonishment from the court. The trial judge instructed Mr. Bates that the comments were inappropriate, and Mr. Bates agreed. Further, the court told Mr. Bates that he owed Mr. Regan an apology, and Mr. Bates stated that he did "apologize for making those statement in open court or in the courtroom in the presence of other persons." The defense also requested a recess until Monday so that the defendant could calm down. However, the court found that the comment did not so impact the defendant that the trial should be delayed until Monday, and the defense objected.
As stated above, a defendant's conviction should not be reversed for errors unless the accused's substantial rights have been violated. Since this episode did not occur in the presence of the jury, it is difficult to envision how the defendant was prejudiced by this remark. Had the defendant been the next witness to testify, perhaps a more compelling argument could be made about the necessity of a recess for defendant to gather his composure. The State presented several more witnesses before resting, and the defense did not present any witnesses *136 before the jury until Monday, September 27. Further, the defendant did not actually testify until September 30. Thus, the defendant had two days after the incident on the 25th to recover before testifying. It is unquestionable that Mr. Bates's behavior was inappropriate. But, it does not appear that the defendant's substantial rights were prejudiced. In the absence of such prejudice, we conclude that reversal is unwarranted.
Next, the defendant contends that he was prejudiced because the prosecutors laughed and made faces in the presence of the jury during defense witnesses' testimony. First, the defendant points to an instance during Jorge Serrano's testimony. The defense approached the bench to state the objection that both prosecutors were "carrying on" and "laughing ... out loud." Immediately thereafter, the trial judge stated, "counsel, you both know better than that," to which Mr. Bates responded, "You are correct." The trial judge emphasized that he expected all of the attorneys to act professionally in the court room, and Mr. Bates apologized.
Defendant also complains of an additional incident occurring during Serrano's testimony involving Mr. Bates. The record reflects that Serrano's appointed attorney approached the bench to convey Serrano's request that Mr. Bates refrain from "making facial expressions" and "laughing" while looking at Serrano. Mr. Bates acknowledged that he had "raised some eyebrows" and "had some smiles on [his] face in response to some things that [Serrano] has said." However, he denied openly laughing at Serrano in the presence of the jury. The defense moved for a mistrial, which the trial judge denied. The judge stated that he had not noticed any "obvious gestures or motions or expressions by Mr. Bates," but cautioned Mr. Bates to be "cognizant" of any of expressions he made.
The defendant also contends the prosecutors engaged in improper conduct during the testimony of Aida Fuentes. On direct examination, defense counsel asked Ms. Fuentes if she recognized the person in a particular photograph, and she replied, "Felippe Gomez. Felix." The State objected and the assistant district attorney allegedly laughed out loud. The attorneys then approached the bench and held a conference out of the hearing of the jury. The trial judge overruled the states objection, however the defense attorney, Mr. Regan, insisted that the judge also provide a ruling regarding the laughter by Mr. Bates. The trial judge finally ordered that everyone act in a professional manner.
Again, during Ms. Fuentes' testimony, the defense objected to the State's conduct. On cross-examination, Mr. Wolff asked whether the jeweler Ted St. Amant was at court, and Ms. Fuentes replied that he was in the hall. Mr. Wolff then responded, "I'm not surprised." The trial court sustained the defendant's objection and admonished Mr. Wolff, pursuant to defendant's request, to refrain from commenting on the witness' testimony.
If an objection is sustained, the defendant cannot on appeal complain of the alleged error unless at the trial level he had requested and had been denied either a mistrial or an admonition. State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8, 40; cert. denied, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998); State v. Nicholas, 359 So.2d 965, 970 (La.1978). Out of the foregoing incidents, defendant only requested a mistrial after Serrano had complained that Mr. Bates was making faces at him. However, defendant does not contest the trial judges denial of the mistrial on appeal. As for the other incident during Serrano's testimony and the incidents during Ms. Fuentes' testimony, the trial judge sustained the defendant's objections *137 and defendant did not request a mistrial or for the trial judge to admonish the jury. Rather, defendant requested that the trial judge admonish the prosecutors' for their behavior, and the trial judge complied.
Among his claims in this assignment, appellate counsel implies that the trial judge treated defendant's trial attorney unfairly, referencing the above-quoted material. However, the context of the trial judges remarks do not so indicate. Further, the record reveals numerous occasions where the trial judge ruled in favor of the defense. The trial judge granted the defense's request to recess for the day on one occasion, took a break for Serrano to review some documents, and allowed a recess for another defense witness to obtain documentation necessary for his testimony. Thus, despite appellate counsel's assertions, the record does not reflect that the trial judge was partial to the State.
Finally, the defendant urges that the totality of the prosecutor's actions indicate a pattern of misconduct that warrants reversal of his conviction. However, the Louisiana Supreme Court has rejected a similar argument in State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326, 1335, cert. denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996). A defendant is entitled to a fair, not a perfect, trial. Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 1968); State v. Simmons, 738 So.2d at 1140. Based on the foregoing, we find that the individual allegations of prosecutorial misconduct do not warrant reversal of the defendant's conviction. Accordingly, the accumulation of these allegations do not warrant reversal either. State v. Scales, supra.

ASSIGNMENT OF ERROR NUMBER NINE
Defendant argues that the cumulative effect of the foregoing errors rendered the trial unfair. He contends that the errors in his case cumulatively mandate reversal. This assignment is moot because we found that none of the foregoing assignments of error warrant reversal. Both this Court and the Louisiana Supreme Court have been "unwilling to say that the cumulative effect of assignments of error lacking in merit warrants reversal of a conviction or sentence." State v. Strickland, 94-0025 (La.11/1/96), 683 So.2d 218, 239; State v. Lyons, 01-719 (La.App. 5 Cir. 11/14/01), 802 So.2d 801, 807. See also, State v. Day, 00-64 (La.App. 5 Cir. 5/30/00), 762 So.2d 264, 270-271; Mullen v. Blackburn, 808 F.2d 1143, 1147 (5th Cir.1987). Therefore, we find this assignment of error moot.

ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The following matters are presented for review.
There are several errors between the multiple offender sentencing transcript and the commitment. The commitment reflects that the trial judge ordered the 75-year enhanced sentence to be served concurrently, but that the remaining life sentence is to be served consecutively. The trial judge did not order the sentences to be served consecutively. Further, the commitment is unclear with regard to the sentence actually received by the defendant. The commitment is clear that the original sentence for attempted murder was vacated and that defendant received a 75-year sentence on that count. However, the commitment thereafter states that the court imposed a life sentence.
Generally, when there is a discrepancy between the minutes and the *138 transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983); State v. Haynes, 96-84 (La.App. 5 Cir. 5/25/96), 676 So.2d 1120, 1123. Accordingly, we order the trial judge to correct the commitment to delete the reference to the life sentence being served consecutively with the 75-year enhanced sentence, and to delete the second reference to the imposition of a life sentence.
In accordance with the above, we affirm the defendant's conviction of second degree murder and attempted second degree murder.
AFFIRMED