772 So.2d 249 (2000)
STATE of Louisiana
v.
Johnny LUNA.
No. 00-KA-858.
Court of Appeal of Louisiana, Fifth Circuit.
October 31, 2000.
*251 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Ellen S. Fantaci, David P. Wolff, Quentin Kelly, Hans P. Sinha, Assistant District Attorneys, Gretna, Louisiana, Attorneys for Plaintiff/Appellee.
Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, Louisiana, Attorney for Defendant/Appellant.
Panel composed of Judges SOL GOTHARD, CLARENCE E. McMANUS, JJ., and H. CHARLES GAUDIN, J. Pro Tem.
GOTHARD, Judge.
Defendant Johnny Luna was charged with of two counts of forcible rape, in violation of La. R.S. 14:42.1. Pursuant to defendant's pretrial motion to proceed pro se, the trial court ruled that the defendant could represent himself with assistance from his court-appointed attorney. Trial was held and a 12-person jury found the defendant guilty as charged. The defendant was sentenced to 30 years imprisonment at hard labor on each count, the sentences to run consecutively.
Thereafter, the State filed a multiple offender bill of information, alleging the defendant to be a fourth felony offender. After a hearing, the trial court found the defendant to be a multiple offender, vacated both previous sentences, and sentenced the defendant to 80 years imprisonment at hard labor on each count, to be served consecutively without benefit of probation, parole, or suspension of sentence. The defendant filed motions for reconsideration of his sentence and for appeal. However, because the record did not reflect a ruling on the motion to reconsider sentence, this Court remanded the matter for that purpose, and did not address the merits of the appeal. State v. Luna, 98-1053 (La.App. 5 Cir. 4/14/99), 738 So.2d 210 (unpublished opinion).
Subsequently, the trial court denied the defendant's motion for reconsideration of his sentence. The appeal was re-lodged pursuant to an order from this Court.

FACTS
This case arises out of charges that the defendant committed forcible rape upon S.N. on August 13, 1995, and upon M.W. on September 6, 1995. Both victims testified that, on separate occasions, they were overcome by force and vaginally raped by the defendant at his apartment after meeting the defendant at a bar for the first time. To the contrary, the defendant testified that the intercourse was consensual.

S.N.
Ms. N. testified that in the early morning hours of August 13, 1995 she and a friend were on Jefferson Highway when her truck stalled. The friend walked to her home, which was close to where the truck had stalled. Ms. N. walked to Wolfman Henry's, a nearby lounge, to obtain some aspirin. The defendant, who was also at the bar, struck up a conversation with Ms. N. She also met the bartender, Janelle, and her boyfriend, "Boogie." When Janelle closed up the lounge, the four decided to have a drink elsewhere. Janelle and Boogie drove the defendant and Ms. N. to Winn Dixie, where the defendant purchased some liquor. Thereafter, Boogie and Janelle drove to the defendant's apartment, but did not come in. Ms. N. said she asked Janelle if she knew the defendant, and Janelle replied affirmatively. Ms. N. then accompanied the defendant inside his apartment, in Jefferson Parish.
Once inside, the defendant began cutting up chicken to cook for them, and fixed drinks for Ms. N. and himself. Ms. N., who lived with her father, went into the living room to telephone her father to let *252 him know she would be home soon. When she picked up the phone, however, there was no dial tone. She saw that the phone was unplugged and reached to plug it in. As she did so, the defendant came from behind her and put his arms around her neck in a "choke hold." She could not breathe and began to panic. The defendant then said for her to remove her "M. F-ing" clothes. She said that she did not remember whether she removed her clothes because she was afraid or whether the defendant took them off. Nonetheless, she testified that the next thing she knew, the defendant pushed her face down into the mattress, put his penis inside of her vagina and raped her by force. The defendant did not ejaculate. At trial, Ms. N. said that the rape caused bleeding inside her vagina. She also stated that she no longer menstruated because she had entered menopause.
After it was over, Ms. N. said that the defendant walked into the kitchen and resumed cooking. Ms. N. said that she was terrified because she kept thinking about the large knife he had used to cut up the chicken. She tried to think of a way to escape without arousing the defendant's suspicions, so she told him she was cold and had to get dressed. Eventually, the defendant went to the restroom, and Ms. N. used the opportunity to flee the defendant's apartment. In her haste, however, she left her shoes. She ran barefooted for some distance and hid in the bushes until daylight. When it was light, she called the police from a nearby lounge and Sergeant Ferd Hebert of the Jefferson Parish Sheriffs Office responded.
Sergeant Hebert testified he was dispatched to the Silver Spur lounge at approximately 6:26 a.m. where he met with Ms. N. After Ms. N. related the morning's events, Sergeant Hebert took her to Lakeside Hospital where she was examined by Dr. Michael Widemann, who was accepted at trial as an expert in the fields of general medicine, gynecology and sexual assault examinations.
Dr. Widemann testified that the external physical examination did not reveal any visible lacerations or bruises on Ms. N.'s body. He said, however, that the internal pelvic examination revealed a bloody discharge from Ms. N., which could have been caused by blunt trauma. He found no evidence of semen, but he explained that he did not expect to find any, since Ms. N. said her attacker did not ejaculate.
After Ms. N.'s examination, Sergeant Hebert recovered the victim's shorts. Later in the day, Sergeant Hebert and another officer went to the defendant's apartment, informed the defendant that a forcible rape complaint had been made against him, and advised him of his constitutional rights. The defendant agreed to allow the officer to search his apartment. Sergeant Hebert recovered the bed sheet, as well as Ms. N.'s shoes, and photographed the scene. According to Sergeant Hebert, the defendant spontaneously remarked during the search of his apartment that the "incident was consensual."
Some of the evidence collected by Sergeant Hebert was tested by forensic serologist, Pamela Williams. Ms. Williams testified that stains on the bed sheet and the crotch of Ms. N.'s shorts tested positive for the presence of blood. The stains on the sheets were insufficient for any further testing, but the blood on Ms. N's shorts was consistent with her blood type. Ms. Williams stated that she did not detect the presence of seminal fluid on any of the samples she tested.
Paul Petta testified on behalf of the defense in regard to the charges involving Ms. N. Mr. Petta stated that he and Ms. N. previously lived in the same apartment complex. He said that Ms. N. was a "nervous" person, and that she had falsely accused him of breaking into her apartment. He also claimed he had observed Ms. N. using crack cocaine. Petta admitted he was a drug addict himself, with several simple burglary convictions, four *253 possession of heroin convictions, and stated that he was facing a life sentence for his recent distribution of heroin conviction.
The defendant testified at trial, and his testimony was substantially the same as Ms. N.'s testimony regarding their initial meeting and arrival at his apartment. However, the defendant stated they engaged in consensual oral sex and intercourse. Defendant admitted that he did not ejaculate. According to the defendant, Ms. N. asked him to give her $60.00 to purchase some crack cocaine, which Ms. N. had denied during her testimony. Defendant denied raping Ms. N. and speculated that Ms. N. had fabricated the instant charges in retaliation for his refusal to give her the money she requested. Finally, the defendant stated that, despite Ms. N.'s testimony to the contrary, he had a small penis. In support of this claim, he offered to display and admit his penis into evidence, a request that the court denied.
The defense also called Officer Nathaniel Riley of the Jefferson Parish Sheriff's Office. He stated that he and Officer Marcus Toony were dispatched after Ms. N telephoned the police from the Silver Spur lounge. Officer Riley observed that Ms. N. was "hysterical." The officer stated he was not present when Officer Toony wrote the police report, and did not know Officer Toony's whereabouts at the time of trial.

M.W.
Ms. W. testified that she met her boyfriend at the Silver Spur at 4:30 p.m. on September 6, 1995, and they had an argument. The boyfriend left, but Ms. W. decided to stay at the lounge to have a few drinks. The defendant was in the bar and offered to buy Ms. W. a drink, but she told the defendant she wanted to be left alone. After a while, the defendant engaged her in conversation and she accepted a drink from him. A short time later, the defendant suggested that they retire to his apartment for drinks. Ms. W. rejected his offer, but proposed that they have drinks and talk at her apartment instead. She suggested that the defendant follow her in his car, but she said the defendant told her he could not do that because he had left his vehicle at home. Ms. W. and the defendant then left the bar in Ms. W.'s car. On the way to her apartment, they stopped to purchase some liquor, and then they stopped at the defendant's apartment because he claimed he needed to change his clothes. Ms. W. initially planned to wait in her car for the defendant, but he suggested that she come inside because it was hot in the car.
Ms. W. went inside his apartment, and while there, the defendant talked about beginning a relationship with Ms. W. She told him she was not interested, since her current relationship was troubled. Despite her response, Ms. W. said the defendant tried to kiss her, but she pushed him away. Ms. W. felt ill and was sick in the bathroom. When she walked out of the bathroom, the defendant grabbed her from behind and began undoing her belt. She resisted the defendant, but he threw her on the bed and pushed her down, holding her throat. Ms. W. said that he then forced her to have sexual intercourse. After that was over, the defendant performed oral sex upon her. She thought he was going to let her leave, but as she began putting her clothes on, the defendant forced her to perform oral sex upon him. Ms. W. said that the defendant did not ejaculate during these incidents.
The defendant then handed Ms. W. her clothes, and after she dressed, the defendant insisted that she remain because he wanted to discuss having a relationship with her. In the course of the conversation, Ms. W. told the defendant he had hurt her while in the bedroom. The defendant "flipped again," straddled her lap, put his hand against her windpipe, and told her that he would "show [her] what rape is." Fearing for her life, Ms. W. tried to diffuse the situation by apologizing to him. The defendant calmed down and wrote his telephone number on a piece of paper so *254 that she could call him. Ms. W. said the defendant insisted on walking her to her car, and she drove to her apartment.
When she reached her apartment, she made three phone calls: one to the defendant, to her best friend, and then to the police. She told the defendant that she was reporting the rape to the police, and that they would be on their way to his apartment. She said she told him she had merely pretended to mollify him because she was afraid of him.
She was interviewed by the police that night. Thereafter, she went to Lakeside Hospital, where she was examined by Dr. Widemann at approximately 11:57 p.m. At trial, Dr. Widemann testified that Ms. W. was very upset and complained her neck was sore from being held down by her attacker. He stated that the external examination showed no signs or lacerations or bruises, but that the complaint of rape was consistent with the history of events related by Ms. W.
Defendant's trial testimony was substantially the same as Ms. W.'s testimony regarding their initial meeting and arrival at his apartment. He pointed out, however, that he did not own a car at the time, despite Ms. W.'s testimony to the contrary. He also claimed that he and Ms. W. had consensual intercourse after she removed her clothes. He denied choking her, but admitted that she started crying while they were having sex. Defendant said he stopped, and told her to get dressed, and he asked her to sit down and talk for a while. He said she told him she had been raped in the past, and he admitted to her that he previously had been accused of rape. Defendant stated that soon after he walked Ms. W. to her car, she telephoned and told him the police were on their way. According to the defendant, he did not understand anything else she said because she was "hysterical."
On cross-examination, the defendant admitted he had prior convictions, including forcible rape when he was 16 years old, of burglary when he was 20, attempted escape at 22, kidnaping for ransom when he was 30, as well as miscellaneous misdemeanor convictions. At the time of trial, defendant said he was 47 years old.
Bonnie Dubourg, an expert forensic serologist, was called as a defense witness. She testified that she conducted testing on the evidence collected from Ms. W. She said that test results were negative for the presence of blood and seminal fluid on the evidence she examined.
Deputy Rosato, another defense witness, testified that she was dispatched to Ms. W.'s apartment on the evening of September 6, 1995 regarding a call of forcible rape. The deputy said that Ms. W. was visibly upset and crying when she arrived at Ms. W.'s apartment. According to Deputy Rosato, Ms. W. related that she had been forced to have vaginal sex with a white male.
Detective Michael Carrone, also called by the defense, testified that he, too, was dispatched to Ms. W.'s apartment. Detective Carrone said that after interviewing Ms. W., he went to the defendant's apartment at about 11:05 p.m. He said the defendant was cooperative. Detective Carrone said that he learned on the following day that Ms. N. had made a complaint of rape against the defendant. The detective further stated that after additional investigation, a warrant for the defendant's arrest was ultimately obtained.
Keith Lobrono, a private investigator, was also called by the defense. He testified that, during the course of investigating the case, he interviewed various people, including Ms. N.'s father, Helen Taylor, Joyce Brown, Greg Hoppe, David Ford, but could not locate one person, Pete Aklin.

ANALYSIS
In his first assignment of error, the defendant contends that his rights to present a defense and to compulsory process were abridged because the trial judge denied his motion to continue based on the *255 absence of defense witnesses. The State responds that the record does not reflect that the defendant either moved to continue the June 23, 1997 trial date or moved for a recess after trial began. The State further responds that the defendant was not prejudiced by the absence of these witnesses because their testimony was not material to the consent defense asserted by defendant.
A continuance is defined as the postponement of a trial or hearing that is granted before the trial or hearing commences. A recess, on the other hand, is a temporary adjournment of a trial or hearing that occurs after a trial or hearing has commenced. LA.-C.Cr.P. art. 708. A jury trial commences when the first prospective juror is called for examination. LA.-C.Cr.P. art. 761.
In this case, the record does not reflect that the defendant moved for a continuance before trial commenced on the basis that his witnesses were absent. The record reflects the defendant knew how to request a continuance, since he had filed a motion for a continuance of the April 1997 trial date. The defendant could have requested a continuance, but he did not. Rather, the defendant was satisfied to proceed to trial with the court's issuance of instanter subpoenas and attachments for his witnesses, in the event they failed to appear.
The record further reflects that after trial had commenced, the defendant continued to request information on the status of his witnesses. Before opening statements on June 24, 1997, the defendant inquired whether his witnesses had been served. Ms. Davis told the court she would check the record for returns on the subpoenas. When the court asked the defendant if he had any objection to trial proceeding, since the State was going to present its case first, the defendant responded, "No. I don't have any objection to that, Your Honor."
At the end of the day, the court revisited the issue of the defendant's instanter subpoenas. After reviewing the defendant's subpoena list with the trial court's minute clerk and with Ms. Davis, the court ordered that all of the subpoenas were to be reissued for those witnesses who were not served, and that attachments were to be issued for those who had been served.
The next morning after four State witnesses had testified, the defendant advised the court that some of his witnesses still had not been served. He requested "ample time" for the subpoenas to be served and moved that the court consider issuing attachments for those witnesses who had been served, but had still not appeared. The trial court responded that the defendant would be allowed to proffer the absent witnesses' testimony at the end of the day, at which time the court would determine whether it was necessary to issue attachments for any of the witnesses. The defendant thanked the court and did not object to the court's ruling.
The next morning, June 26, 1997, the court inquired on the status of the returns. After discussion between Ms. Davis, the defendant, and the court, it was determined that the record reflected some, but not all of the witnesses had been served. The court issued attachments for those witnesses who had been served but who had not appeared. The defendant proffered the testimony of some of the witnesses. Thereafter, the discussion turned to the issue of jury instructions, and the defendant still did not move to recess trial.
The decision on a motion for recess or continuance lies within the discretion of the trial court and will not be reversed absent an abuse of that discretion. See, State v. Wille, 559 So.2d 1321, 1334 (La. 1990); State v. Bailey, 97-302 (La.App. 5 Cir. 4/28/98), 713 So.2d 588, 609, writ denied, 98-1458 (La.10/30/98), 723 So.2d 971. Since the record does not reflect defendant moved for a continuance or a recess, we *256 find that the trial judge's proceeding with trial was not an abuse of discretion.
The defendant additionally complains that he was denied the right to compulsory process by the absence of his witnesses. The right of a defendant to compulsory process is the right to demand subpoenas for witnesses and the right to have those subpoenas served. State v. Latin, 412 So.2d 1357, 1361 (La.1982). The right of a defendant to call witnesses on his behalf is guaranteed by the federal and state constitutions and in this state's statutory law. U.S. Const. amend. VI; La. Const. art. I, § 16 (1974). The defendant claims that his right to compulsory process was denied because trial proceeded without his witnesses despite his repeated requests, before and during trial, that his witnesses be subpoenaed.
On June 23, 1997, before trial began, the defendant told the court that he had not had the opportunity to subpoena his witnesses for trial because he did not know that the case was set for trial on that day. The defendant asserts that he was not present in court when the trial date was set. Thus, the minute entry, at least, appears to support the defendant's assertion that he was not present when the June 23, 1997 trial date was set.
LA.-C.Cr.P. art. 702 provides for setting cases for trial as follows:
Cases shall be set for trial by the court on motion of the state, and may be set for trial on motion of the defendant. Courts shall adopt rules governing the procedure for setting cases for trial and giving notice thereof. The defendant shall be given notice of trial sufficiently in advance thereof so that he may summon his witnesses.
We have reviewed the record and we find that the record indicates the defendant had actual notice of the trial date, through writ dispositions, among other things, even if he were not present when the trial was set. Moreover, as pointed out by the assistant district attorney, the defendant apparently knew that trial was set for June 23, 1997, since one of the defendant's witnesses appeared for trial on that date pursuant to a subpoena issued by the defendant.
Finally, we note that even if the defendant had not been sufficiently notified of trial to timely subpoena his witnesses, reversal is not necessary in this case. In order to show prejudicial error sufficient to warrant reversal, the defendant must show that the testimony that the witness would have given would have been favorable to the defense and would indicate the possibility of a different result. State v. Nicholas, 97-1991 (La.App. 4 Cir. 4/28/99), 735 So.2d 790, writ denied, 99-1511 (La.10/29/99), 748 So.2d 1159. In Nicholas, the court held the trial court did not abuse its discretion in denying the defendant's oral request to continue the trial in order to subpoena defense witnesses because the absence of the testimony did not prejudice the defendant. Id. at 799-800.
In this case, the record reflects that the defendant proffered the testimony of several witnesses. The defendant contends that the testimony of several of these unavailable witnesses would have supported his consent defense by establishing that Ms. W. willingly accompanied him to his apartment, and that she was not visibly upset when she left his apartment. However, even if these witnesses had testified, it would not have bolstered the defendant's consent defense, since Ms. W. herself admitted to the jury that she voluntarily went to his apartment, and she explained that she was only pretending to be calm when she left the defendant's apartment.
Defendant also claims he was prejudiced by the absence of testimony which would have impeached Ms. W.'s testimony as to the availability of seats in the bar. Again, the record reflects that Ms. W. stated she sat next to the defendant because it was the only available seat at the bar. She *257 said, however, that there were seats at tables in the bar. Thus, the testimony that there were no other seats at the bar would only have been cumulative of what Ms. W. had said.
In connection with the defendant's proffer, the trial judge found that the testimony related to what occurred at the bar, not what occurred between the defendant and Ms. W. Although the judge did not specifically so state, the context of his remarks appears to indicate that the judge believed the proffered testimony to be irrelevant. This Court has recognized the right to present a defense does not require a trial court to permit the introduction of evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice. State v. Winfrey, 97-427 (La.App. 5 Cir. 10/28/97), 703 So.2d 63, 76, writ denied, 98-0264 (La.6/19/98), 719 So.2d 481; State v. Carter, 96-358 (La.App. 5 Cir. 11/26/96), 685 So.2d 346, 351.
We find that the defendant was not denied the rights to present a defense or the right to compulsory process because of his apparent knowledge of the trial date, his failure to file a continuance, and his failure to move for a recess. We further find that defendant was not prejudiced by the absence of testimony from the absent witnesses because their alleged testimony was either cumulative or immaterial. State v. Nicholas, supra.
In his second allegation of error, the defendant contends that his waiver of counsel was invalid because the judge failed to conduct a sufficient inquiry into the defendant's background or adequately warn him against the dangers of self-representation before allowing the defendant to represent himself. The State contends the defendant's waiver was valid.
A defendant in a criminal trial has a constitutional right to represent himself, as recognized in Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).[1] The Sixth Amendment to the United States Constitution "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." Faretta v. California, 422 U.S. at 819, 95 S.Ct. at 2533. Once informed of the right to counsel, a defendant may intentionally waive that right. Johnson v. Zerbst, 304 U.S. 458, 463-468, 58 S.Ct. 1019, 1023-1024, 82 L.Ed. 1461 (1938); State v. Strain, 585 So.2d 540, 542 (La.1991); State v. Price, 96-680 (La.App. 5 Cir. 2/25/97), 690 So.2d 191, 195.
Because an accused managing his own defense relinquishes many of the traditional benefits associated with the right to counsel, he or she must knowingly and intelligently forego those benefits in order to represent himself. Faretta; State v. Strain; State v. Guccione, 96-1049 (La.App. 5 Cir. 4/29/97), 694 So.2d 1060, writ denied, 97-2151 (La.3/13/98), 712 So.2d 869. When accepting a waiver of counsel at trial, the judge should advise the accused of the nature of the charges and the penalty range, should inquire into the accused's age, education and mental condition, and should determine according to the totality of the circumstances whether the accused understands the significance of the waiver. State v. Strain, 585 So.2d at 542. The Louisiana Supreme Court later explained in State v. Stevison that "Strain did not establish inflexible criteria or a magic word formula for determining the voluntariness of a waiver." State v. Stevison, 97-3122 (La.10/30/98), 721 So.2d 843, 844-45. Rather, Stevison emphasized that "the inquiry into the validity of the accused's waiver of counsel must take into account the totality of the circumstances in each case." Id. at 845.
*258 In this case, prior to granting the defendant's request to represent himself, the trial judge then inquired into the defendant's background. When the court questioned the defendant about his education, the defendant responded that he had attended "one term of college." The defendant also told the court that he had represented himself in 1980 in a "charge of kidnap and ransom" involving his former girlfriend. After the court informed the defendant that he would be held to the same standard as an attorney in the event he elected to represent himself, the defendant said that he understood. The judge then told the defendant that he was not convinced the defendant had the requisite legal skills to represent himself without assistance. Richard Tompson of the Indigent Defender Board was present in court and requested that the court clarify to the defendant that the assisting attorney would not be the defendant's "personal slave." The judge ruled that the defendant would be permitted to represent himself; however, he also appointed Ms. Davis of the Indigent Defender Board to assist the defendant.
We find from the record before us that defendant's conduct supports a finding that the waiver of counsel was valid. The defendant filed various pre and post-trial motions that indicate he had knowledge of the legal system. During voir dire, defendant addressed prospective jurors with respect and asked intelligent questions. At trial, defendant thoroughly examined witnesses, including vigorous cross-examinations of the State's witnesses. The record further reflects that the defendant was aware of the seriousness of the penalty he faced. In one of his many habeas petitions, defendant asserted he would "spend a minimal of 20 flat years of his life in prison, so has stated the prosecutor, if not the remainder of his life."
We also note that the defendant's past experience with the criminal justice system also supports a finding that he understood the waiver of counsel. See, State v. Norman, 99-600 (La.App. 5 Cir. 2/16/00), 756 So.2d 525. At trial, the defendant admitted he had prior convictions for burglary, attempted escape, kidnaping, forcible rape, as well as other convictions. We also note that defendant informed the judge at the March 27, 1997 Faretta hearing that he had previously represented himself in connection with the kidnaping charge.
We find that the record indicates that the defendant's waiver of counsel was valid. Defendant vehemently expressed his aversion to being represented by an Indigent Defender Board attorney. While an indigent accused has the right to the assistance of counsel, he does not have the right to a particular attorney. State v. Harper, 381 So.2d 468, 470; State v. Bond, 650 So.2d 354, 358. In fact, the defendant recognized this legal principle in one of his many pro-se motions.
As pointed out by State v. Flanagan, 32-535 (La.App. 2 Cir. 10/29/99), 744 So.2d 718, 726, "the trial court cannot be called upon to appoint counsel other than the one originally appointed merely to please the desires of the indigent accused in the absence of an adequate showing that the court-appointed attorney is inept or incompetent to represent the accused." While Mr. Luna complained of a conflict between himself and any Indigent Defender Board attorney, the record is devoid of evidence to support these assertions.
Given the defendant's extensive past experience with the criminal justice system, and his conduct in the instant matter, we find that the totality of the circumstances in this record demonstrates that the defendant validly waived his right to counsel.
In his third assignment of error, defendant contends that the trial judge improperly sentenced him as a multiple offender on both underlying convictions of forcible rape. The State responds that the trial judge properly enhanced both of the defendant's convictions because each conviction arose out of a separate incident.
*259 In the habitual offender bill of information, the State alleged the defendant to be a fourth felony offender after being convicted of the underlying offenses, two counts of forcible rape. However, at the habitual offender hearing on March 30, 1998, the assistant district attorney indicated that the State only had sufficient evidence to prove the defendant was a second felony offender because the records of the defendant's Oregon convictions (the first and second predicate offenses) were unavailable. At the conclusion of the hearing, the trial judge stated that he found the defendant "guilty as a multiple offender on two counts, and I am sentencing you to eighty years on each count, and said sentences are to be served consecutively."
Only one underlying conviction arising out of a multi-count bill of information can be enhanced when the convictions were entered on the same day and when the offenses arise out of one criminal episode. State ex rel. Berry v. State of Louisiana, 96-0367 (La.5/16/97), 693 So.2d 787; State ex rel. Porter v. Butler, 573 So.2d 1106, 1109 (La.1991). However, the Louisiana Supreme Court explained in State ex rel. Porter v. Butler, that this rule does not apply when the convictions arise out of separate criminal episodes:
Where an offender with a prior felony conviction subsequently commits multiple separate felonies and is thereafter convicted of the subsequent felonies, he is subject to being adjudicated a habitual offender as to each conviction. It matters not that the convictions occur on the same date. [State v. ]Sherer[ 411 So.2d 1050 (La.1982)], which involved convictions arising out of a single criminal act, should not be applied to limit enhancement of more than one conviction obtained on the same day arising out of separate criminal offenses committed at separate times.
However, policy considerations support the continued viability of the rule precluding habitual offender enhancement of more than one conviction obtained the same date arising out of a single criminal act or episode.
Id. at 1109.
Mr. Luna's convictions, however, arose out of two counts of forcible rape against two different victims occurring on two different dates, August 13, 1995 and September 6, 1995. Therefore, since it appears that the underlying convictions arose out of separate criminal episodes, the trial judge did not err in adjudicating defendant a habitual offender as to each conviction. State ex rel. Porter v. Butler, at 1109.
In addition we have reviewed the record for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990), and find the following errors which merit action.
The record reflects that there are a number of patent errors regarding the defendant's habitual offender sentence. First, the habitual offender commitment and minute entry reflect that the court found the defendant to be a habitual offender, but the court did not specifically state whether the defendant was a second, third or fourth offender. In this case, the record is sufficient to determine that the State's evidence was restricted to one prior felony and the trial judge's finding of habitual offender status could only relate to a second offense, thus there is no need to remand the case for rehearing of the habitual offender bill. See, State v. Henderson, 94-286 (La.App. 5 Cir. 12/14/94), 648 So.2d 974.
It is further noted that although the transcript of the defendant's enhanced sentencing on March 30, 1998 reflects that the trial judge imposed the enhanced sentence without benefit of parole, probation or suspension of sentence, the minute entry/commitment does not so reflect. Accordingly, we order the trial court to amend the commitment to reflect that the enhanced sentence was imposed without *260 benefit of parole, probation, or suspension of sentence.
Finally, the record reflects that the trial judge did not inform the defendant of the prescriptive period within which to file for post conviction relief as provided by LA.-C.Cr.P. art. 930.8. At the time of the defendant's sentencing, the article provided for a prescriptive period of three years; however, article 930.8 was amended effective August 15, 1999 to shorten the prescriptive period from three years to two years. This Court has held that the application of the amended prescriptive period would not violate ex post facto prohibitions, since the article itself does not relate to an offense or its punishment. See, State v. Gilbert, 99-315 (La.App.4/25/00), 760 So.2d 536, 539. See also, State ex rel. Glover v. State, 93-2330 (La.9/5/95), 660 So.2d 1189, 1201.
Accordingly, we remand this matter and order the trial judge to send written notice of the amended prescriptive period, and of the time when the period begins to run within ten days of the rendering of this opinion, and to file written proof in the record that defendant received such notice.
For the above discussed reasons, the defendant's conviction and sentence are affirmed. The case is remanded and the trial court is ordered to amend the commitment to reflect that defendant's enhanced sentence was imposed without benefit of parole, probation, or suspension of sentence, and to inform the defendant of the delays for filing post conviction relief and place in the record written proof that defendant received such notice.
CONVICTION AND SENTENCE AFFIRMED; CASE REMANDED WITH ORDERS.
NOTES
[1] The United States Supreme Court recently re-examined Faretta in Martinez v. Court of Appeal of California, 528 U.S. 152, 120 S.Ct. 684, at 692, 145 L.Ed.2d 597 (2000). In Martinez, the Court held that a defendant has no Sixth Amendment right of self-representation on direct appeal from a criminal conviction.