STATE OF LOUISIANA                          NO. 19-KA-547

VERSUS                                      FIFTH CIRCUIT

BOBBY R. JOHNSON                            COURT OF APPEAL

                                            STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 17-71, DIVISION "D"
HONORABLE SCOTT U. SCHLEGEL, JUDGE PRESIDING


September 09, 2020


**FREDERICKA HOMBERG WICKER**
**JUDGE**


Panel composed of Judges Fredericka Homberg Wicker,
Stephen J. Windhorst, and Hans J. Liljeberg


**<u>CONVICTIONS AND SENTENCES AFFIRMED; REMANDED WITH</u>**
**<u>INSTRUCTIONS</u>**
>    **FHW**
>    **SJW**
>    **HJL**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
    Honorable Paul D. Connick, Jr.
    Thomas J. Butler
    Anne M. Wallis
    Zachary P. Popovich
    Tucker H. Wimberly

COUNSEL FOR DEFENDANT/APPELLANT,
BOBBY R. JOHNSON
    Bertha M. Hillman

**WICKER, J.**

Appellant, Bobby Johnson, appeals his May 2019 conviction for first degree robbery and simple kidnapping. Johnson claims that the district court erred in denying his motion—made at the conclusion of the State's case-in-chief on May 14, 2019—to continue the trial until the State delivered a material witness, Bruce Alexander, who was in the custody of the Department of Corrections (DOC). He claims that the denial deprived him of the right to a fair trial and entitles him to reversal of the conviction and remand for a new trial.

For the following reasons, we find no error in the district court's denial of the motion and affirm defendant's convictions and sentences, however, based on our review of this case for errors patent, we remand this matter to the district court for correction of the State of Louisiana Uniform Sentencing Commitment Order (UCO) and specified minute entries.

## I. FACTUAL AND PROCEDURAL HISTORY

On January 18, 2017, the Jefferson Parish District Attorney filed a bill of information charging defendant, Bobby R. Johnson, with armed robbery with a firearm in violation of La. R.S. 14:64 and La. R.S. 14:64.3(A) (count one), possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1 (count two), and simple kidnapping in violation of La. R.S. 14:45 (count three).[1] Trial began before a twelve person jury on May 13, 2019.

On November 18, 2016, Deputy Thomas Rodgerson with the Jefferson Parish Sheriff's Office responded to a call that a woman was robbed in Metairie, Louisiana. Upon arriving at the twenty-four-hour Walmart on Williams Boulevard in Kenner, Deputy Rodgerson met with the victim, Mrs. Anastasia "Stacy" Crider.

---

[1] On May 13, 2019, the bill of information was amended to correct the date of the offense on count two from November 21, 2016 to November 18, 2016.

According to Mrs. Crider, shortly after midnight on November 18, 2016, she was feeding stray cats behind a shopping center near North Wilson and Airline Drive in Metairie when a man came up behind her, pressed her into her vehicle, put a gun to the side of her face, and said "Give me your cash. Give me your cash."

Aware of the "cold metal against [her] face," Mrs. Crider informed the man that she did not have any cash and offered him her debit card after showing him the empty compartments in her wallet. After declaring that Mrs. Crider "better give [him] the right PIN number," the man tied Mrs. Crider's hands and forced her to crawl over the console from the driver's side of her Hummer SUV to the passenger side, where she perched on top of cat supplies covering the floorboard and seat. Thereafter, the man warned Mrs. Crider to face the passenger window and not to look at him while he drove her vehicle to the Jefferson Financial Bank across the street.

Mrs. Crider testified that the man made several attempts to use her debit card at the drive-thru ATM to no avail. When the man inquired whether Mrs. Crider had given him the correct PIN number, she assured him that she had and suggested that the card might work at a Chase Bank.

The man proceeded to drive to the Chase Bank on Veterans Boulevard, covering Mrs. Crider's head with his hoodie during the trip and retrieving it before exiting the vehicle to use the ATM. After another failed attempt to withdraw money, the man returned to the vehicle, untied Mrs. Crider, and stood behind her at the ATM as she tried to withdraw money. Mrs. Crider testified that she was also unable to withdraw cash; the ATM notified her that there was an issue with the account, and she needed to contact customer service.

Mrs. Crider testified that the man put her back in the car and tied her hands again. Mrs. Crider also testified that the man was determined to find a way to get cash, so, in an attempt to extricate herself from the situation, she suggested that she

could have a friend bring her money. When the man rejected that idea, she suggested that he could get cash back at a Walmart.

The man drove Mrs. Crider's Hummer to the twenty-four-hour Walmart in Kenner, where he parked in front of a closed business away from the front entrance of Walmart and, once again, covered Mrs. Crider's head—this time with a tarp cover. Mrs. Crider testified that he took the car keys with him when he exited the vehicle. While the man was in the store, Mrs. Crider was able to free her hands, retrieve her cell phone from the floorboard where the man had thrown it, and exit the vehicle. She took a photograph of her license plate before running into Walmart screaming, "Call the police. Call the police." At that time, the man fled from the Walmart on foot, taking Mrs. Crider's car keys and debit card with him.

Detective Marc Macaluso with the Jefferson Parish Sheriff's Office robbery division testified that he took over the investigation initiated by Deputy Rodgerson. He obtained still photographs from the drive-thru ATM at Jefferson Financial as well as video surveillance and still photographs from the ATM at Chase Bank and the Walmart. Bank records for Mrs. Crider's debit card indicated that the card was repeatedly used and declined after the man fled the Walmart. Using this information, Detective Macaluso also obtained surveillance photographs taken and recorded during an attempt to withdraw money from Metairie Bank around 5:00 a.m. on November 18, 2016.

Detective Macaluso recounted that he circulated several of the surveillance photographs through a "Be on the Lookout" email to "metrowide law enforcement" including "probation, parole, federal law enforcement, [and] State troopers." Mr. Johnson's Probation Parole Agent Patrick O'Brien responded to the email, identifying Mr. Johnson as the man in the photographs.[2] Mr. Johnson was

---

[2] Defendant testified at trial about his prior conviction. He stated that he pled guilty to kidnapping and armed robbery in 1996 because he was involved in the incident. He testified that he chose to go to trial this time because, unlike the prior offense, he is not guilty of this crime.

arrested on the evening of November 18, 2016, at his home which was in "very close proximity to the scene of the abduction." Police searched defendant's home but found nothing of evidentiary value aside from Mr. Johnson's clothing that was visible in the various surveillance photos.

Detective Macaluso reported that he met with Mrs. Crider on November 19, 2016, to interview her and show her a photo line-up containing Mr. Johnson's booking photo from the night before. Mrs. Crider identified Mr. Johnson as the perpetrator. During that meeting, crime scene technicians took additional photographs of Mrs. Crider's vehicle and collected additional evidence, such as a black belt Mrs. Crider identified as the one Mr. Johnson used to tie her hands.

Cell tower location data from Mr. Johnson's phone placed him in the area where Mrs. Crider was robbed and kidnapped. Furthermore, Marcela Zozaya, an expert in forensic DNA analysis, tested DNA retrieved from the belt Mrs. Crider testified was used to tie her up. In her expert opinion, both Mr. Johnson and Mrs. Crider had contact with the belt.

Mr. Johnson testified at trial and denied robbing and kidnapping Mrs. Crider. According to his testimony, Mr. Bruce Alexander dropped him off at the strip mall on North Wilson and Airline Drive, an area near Mr. Johnson's home where he had arranged to meet people and sell them drugs. After completing the intended sales, Mrs. Crider drove up and asked Mr. Johnson if he knew where she could purchase crack cocaine. He asked what she wanted and how much she wanted to spend, to which she replied that she did not have any cash, but she wanted to try the product first. Thereafter, Mr. Johnson got in the passenger seat of her vehicle and Mrs. Crider produced a pipe with which she tried the crack. Mr. Johnson testified that she gave him a "thumbs up, like it was good," and wanted to purchase $150.00 worth. However, she begged Mr. Johnson to drive her to get cash because she was "high" and "couldn't move at first." While he went around

to the driver's side, Mrs. Crider crawled over the console to get in the passenger seat. When he sat down in the driver's seat, Mr. Johnson felt something underneath him, and drew out a black belt which he threw to the side.

Mr. Johnson tried to withdraw cash at the drive-thru ATM at Jefferson Financial using the PIN number Mrs. Crider gave him, but the machine said "something about customer service." Mrs. Crider suggested that they go to a Chase Bank since she banks with Chase. After attempting to use the card several more times at Chase Bank, Mr. Johnson returned to the vehicle and asked Mrs. Crider, "Is [*sic*] you sure you got money on this card because I don't like being in Kenner because that's why I went to jail last time[?]" Thereafter, Mrs. Crider tried the card herself, but was also unable to withdraw cash. She then suggested that they try to get cash back from Walmart.

Mr. Johnson parked away from the entrance of Walmart because he was worried that someone would see a black man with a white woman at one o'clock in the morning and get the wrong idea. Mr. Johnson went inside the store, then returned to the vehicle to verify the PIN number she gave him before re-entering the store.[3] While he was in line behind another customer, Mrs. Crider entered the store and yelled that she had called the police. Mr. Johnson, knowing that he was on parole and in possession of drugs, ran back to the car to retrieve the drugs[4] and fled Walmart on foot.

Mr. Johnson testified that he never tied Mrs. Crider up, covered her head, or took her cell phone. He further denied having a gun with him that night, stating that he had never owned a gun. Although Mrs. Crider testified to having seen the

---

[3] Video surveillance from Walmart appears to corroborate Mr. Johnson's testimony that he entered the store, returned to the vehicle, and then returned to the store. The video shows him enter the store once, exit, and walk back in the direction he came from. The video then shows defendant come back and re-enter the store. Another video angle focuses on the parking lot where Mrs. Crider's vehicle is parked. This video also shows defendant leave the vehicle, return, and then leave the vehicle again before Mrs. Crider exits.

[4] On cross-examination, Mr. Johnson stated that the drugs remained in his pocket throughout the entire incident.

black semi-automatic handgun, once the gun was no longer in her face, she "never saw it again," did not see or hear him put it anywhere, and did not feel it in the pockets of his hoodie.

Mrs. Crider testified that she has never done drugs—in fact, she never takes anything stronger than Tylenol or Ibuprofen despite sciatic nerve issues—she would not know where to buy drugs, and has never asked for or bought drugs from Mr. Johnson. Earl Crider, Mrs. Crider's husband, stated that, in the twenty-four years they have been married, he has never known his wife to do drugs. Mr. Donald Reese, a neighbor who came to drive Mrs. Crider home from Walmart after 1:00 a.m. on November 18, 2016, testified that Mrs. Crider was nervous but that she was not "hyper." Both Deputy Rodgerson and Detective Macaluso also testified that Mrs. Crider did not seem to be high or hungover during their interactions with her.

Brian Lebourgeois, an appointee to the Jefferson Parish Animal Shelter Advisory Board, testified to Mrs. Crider's involvement in a community cat program wherein volunteers feed stray cats in Jefferson Parish. Mr. Crider testified that, in addition to feeding stray cats, his wife spent hours a day, usually early in the morning, trapping stray cats to get spayed and neutered. She also ran a cat foster and adoption business out of the couple's home. Mrs. Crider testified that she engaged in cat rescue efforts every night, usually beginning between 12:00 a.m. and 1:00 a.m., because the cats come out when there are less people around and the businesses are closed. Mr. Reese, Mrs. Crider's neighbor, also testified to his knowledge of Mrs. Crider's nighttime activities, as his wife was similarly engaged in animal rescue efforts and sometimes worked with Mrs. Crider. The shopping center where the incident occurred was a location that Mrs. Crider frequented every other night.

Finally, Detective Macaluso interviewed defendant after his arrest on November 18, 2016.[5] During that interview, Mr. Johnson stated he found Mrs. Crider's debit card at the Metairie Bank around 3:30 a.m. but discarded it when it did not work. He did not mention selling drugs. Mr. Johnson testified that at no point, during or after that interview, did he explain to officers or the District Attorney's Office his version of why he was really with Mrs. Crider because he was a parolee and did not know Mrs. Crider would say he robbed her.

Several continuances were granted after Mr. Johnson's arraignment on February 6, 2017, until trial was finally set to begin on May 13, 2019. On May 2, 2019, the defense filed a petition for writ of habeas corpus ad testificandum asking that Bruce Alexander be produced to testify on May 15, 2019. In the petition, Mr. Johnson stated that Bruce Alexander was "confined in the C. Paul Phelps Correctional Center" in Dequincy, Louisiana, and that it was necessary for Mr. Alexander to "be present on or before Wednesday, May 15, 2019, Division 'D' to testify[.]" The signed order issued the writ to the Warden of the C. Paul Phelps Correctional Center "including but not limited to" the Warden of the Jefferson Parish correctional facility and anyone else that may have custody of the witness.[6]

On May 13, 2019, the first day of trial, the defense raised no issues regarding the absent witness although the State was confident that the trial would conclude on May 14, 2020, and the trial judge mentioned his intention to complete the trial in two days multiple times.

On May 14, 2019, after making appearances, defense counsel informed the court that she previously filed a writ to have a witness "come to court today." She

---

[5] The recorded interview was played for the jury.

[6] The petition was filed on May 2, 2019. However, the signed order shows that, on the date line provided on the order, the judge crossed through "May" and wrote "April" above it. As such, it appears the order was incorrectly dated April 2, 2019. Therefore, it also appears that the trial judge mistakenly said that the writ was filed "over a month" before trial when denying the motion to continue. *Infra,* at 10. However, we find that the misstatement does not undermine the soundness of the ruling.

further stated, "He's at the Quinton Work-Release Program in [De]Quincy, Louisiana, and I spoke to a woman on the phone this morning and although I filed the writ in the appropriate place and everyone has received it, he has not been transported." The judge pointed out that the petition for writ of habeas corpus was dated May 15, 2019, not May 14. The defense stated that she "scratched it out and wrote 14," to which the judge responded that the one he signed did not have it scratched out. The defense said she sent something different.[7] The assistant district attorney's investigator was dispatched to determine Mr. Alexander's whereabouts, "when he's going to be here today," and "if not, why not," while the State continued its case.

After the State rested its case at approximately 10:00 a.m., the issue was further addressed. While the defense's petition for writ of habeas corpus alleged that Mr. Alexander was confined in the C. Paul Phelps Correctional Center, the State informed the district court that the facility was shut down in 2012 and replaced with "something called LA Work Force[.]" Further, Mr. Alexander was not at Louisiana Work Force's facility in DeQuincy, LA—over 200 miles away.[8] He was working as a garbage man until 7:00 p.m. and was unreachable until the workday was complete.

The trial judge then informed the defense, "You're going to have to tell me why he's material to your case for us to rest at 10:10 on Day 2." After a brief recess, the defense asserted that Mr. Alexander would provide two pieces of testimonial evidence:

> The first being that Mr. Alexander dropped [Mr. Johnson] off at the alleged crime scene or rather the strip mall and that the victim's—he saw the victim's car in the strip mall.

---

[7] No version of the writ requesting Mr. Alexander's presence on May 14, 2019 appears in the record.

[8] Google Maps shows that Louisiana Workforce, LLC is in approximately the same location as the now-closed C. Paul Phelps Correctional Center on Highway 27 in DeQuincy, Louisiana. The facility is approximately 240 miles from the 24th Judicial District Court in Jefferson Parish, almost four hours travelling by automobile.

The second piece of evidence is a phone call that may—that Bruce Alexander made from jail to someone not related to my client in any way saying that he didn't know my client to own a gun.

Therefore, the defense continued, "those are two pieces of evidence that "if you don't allow, you know, a continuance for him to be present,[9] that I'd be allowed to [admit] through a jail phone call because the witness is unavailable."

The State objected to a continuance and to the admission of the phone call arguing that Mr. Alexander was not "statutorily unavailable . . . under 804(a)5" because the defense could have brought up his absence on the first day of trial, and the witness's presence "could have been obtained." The defense responded, "it was out of the defense's control;" she faxed the writ, and it was Jefferson Parish Correctional Center's responsibility to transport him.

The defense further informed the court that she had spoken to Mr. Alexander twice. During the second conversation, Mr. Alexander "said that he did not want to testify, that he was going to take the Fifth Amendment," and "added that he had nothing of evidentiary value to add."

Thereafter, the district court stated,

The Court is going to deny the continuance until tomorrow. The Court does not find that this information: One, the Court, based upon that assertion, does not believe that there is sufficient evidence to believe that Bruce Alexander: One, would testify; two, that we could get him by tomorrow morning to testify. He doesn't get off of work, wherever he is, until 7:00. No one has told me that he can be transported or would be transported by tomorrow for the trial.

The Court notes, also, that the Court would not allow him to testify to that jailhouse call. Even if he were to testify that he does not know the Defendant to own a firearm, the Court does not find that would be admissible evidence anyway. The fact that he didn't see him with a gun, if he even dropped him off, again, is not dispositive or material to this case.

The Court will also note the Defense was [saying]—in opening statements that this was a drug purchase, which is completely separate from what Mr. Alexander would even possibly testify to. As a result, the Court does not find this information material to the Defendant's defense, and the Court also notes that the writ was filed over a month

---

[9] This is the first time defense counsel directly referenced a continuance.

ago, and the first this Court is hearing about it is Tuesday morning before we started trial at 9:00 a.m.

Your request to continue until tomorrow is denied.

Defense counsel objected to the ruling.

At the conclusion of the trial on May 14, 2019, the jury found defendant guilty of the lesser charge of first-degree robbery (count one), not guilty of possession of a firearm by a convicted felon (count two), and guilty as charged as to simple kidnapping (count three). On May 23, 2019, the district court sentenced defendant to forty years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence as to count one to run concurrent with the sentence of five years imprisonment at hard labor as to count three. The sentence on count one was to run "consecutive to any and all other sentences you are currently serving. If you have any parole time left that is to run consecutive to that time." Mr. Johnson was given credit for time served and ordered to pay court costs in the amount of $451.50. At that time, the defense objected to the sentence as excessive, and the State noticed its intention to file a multiple offender bill.

On June 19, 2019, Mr. Johnson filed a *pro se* "writ of habeas corpus" in which he essentially sought a new trial. On June 21, 2019, he filed a motion for reconsideration of sentence and a motion for appeal. The district court granted the motion for appeal on June 26, 2019. On July 2, 2019, the State filed a multiple offender bill of information on count one—armed robbery with a firearm— alleging Mr. Johnson to be a second felony offender. On October 17, 2019, after Mr. Johnson stipulated to the multiple offender bill, the trial court vacated his original sentence as to count one and resentenced him as a second-felony offender to fifty years imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence to run concurrently with the previously imposed sentence for count three.

Mr. Johnson's sole assignment of error on appeal challenges the district court's denial of his May 14, 2019 motion to continue the trial.

## II. DISCUSSION

Mr. Johnson contends that the trial court abused its discretion in denying his motion for a one-day "continuance" to permit the State to secure the attendance of Bruce Alexander, a material witness to Mr. Johnson's defense who at the time was in the custody of the Department of Corrections and whom Mr. Johnson had properly subpoenaed. We disagree.

While defendant labeled his motion as a motion for continuance, it is more appropriately labeled a motion for recess. Louisiana Code of Criminal Procedure art. 708 defines continuance and recess as follows: "A continuance is the postponement of a scheduled trial or hearing, and shall not be granted after the trial or hearing has commenced. A recess is a temporary adjournment of a trial or hearing that occurs after a trial or hearing has commenced."

Inasmuch as the trial had already begun with the calling of the first juror, as provided in Code of Criminal Procedure art. 761, a continuance could no longer be granted. La. C.Cr.P. art. 708; *State v. Mizell*, 341 So.2d 385, 386 n.1 (La. 1976); *State v. Washington*, 272 So.2d 355, 360 (La. 1973). The motion then is more properly a motion for a recess, a temporary adjournment of a trial after it has commenced, which need not be in writing or comply with the formal requisites of a motion for a continuance. *Id.*; *State v. Hines*, 311 So.2d 871 (La. 1975). Accordingly, our discussion treats Mr. Johnson's motion as though it had been properly denominated. *See e.g. State v. Bertrand*, 381 So.2d 489, 491 n.1 (La. 1980); *State v. White*, 389 So.2d 1300, 1301 (La. 1980); *State v. Ford*, 42,928 (La. App. 2 Cir. 2/13/08), 976 So.2d 321, 328, *writ denied,* 08-605 (La. 10/3/08), 992 So.2d 1010.

A motion for recess is evaluated by the same standards as a motion for a continuance. *See, e.g.*, *State v. Rodriguez*, 02-334 (La. App. 5 Cir. 1/14/03), 839 So.2d 106, 117, *writ denied*, 03-482 (La. 5/30/03), 845 So.2d 1061, *cert. denied*, 540 U.S. 972, 124 S.Ct. 444, 157 L.Ed.2d 321 (2003). Louisiana courts have applied code articles regarding motions to continue to motions for recess. *See, e.g., White*, 389 So.2d at 1302; *State v. Lee*, 11-398 (La. App. 4 Cir. 1/30/12), 83 So.3d 1191, 1197; *State v. Douglas*, 10-2039 (La. App. 1 Cir. 7/26/11), 72 So.3d 392, 401, *writs denied*, 11-2307 (La. 5/25/12), 90 So.3d 406 and 12-2508 (La. 5/3/13), 115 So.3d 474; *State v. Kinsey*, 42,935 (La. App. 2 Cir. 2/13/08), 976 So.2d 315, 317.

According to Code of Criminal Procedure art. 712, "[a] motion for continuance, if timely filed, may be granted, in the discretion of the court, in any case if there is good ground therefor." *State v. Shannon*, 10-580 (La. App. 5 Cir. 2/15/11), 61 So.3d 706, 714-15, *writ denied*, 11-559 (La. 9/30/11), 71 So.3d 283. The Louisiana Supreme Court has consistently held that the decision whether to grant or refuse a motion for a continuance rests within the sound discretion of the trial judge, and a reviewing court will not disturb such a determination absent a clear abuse of discretion. *Id*. at 715. In addition, the Louisiana Supreme Court and this Court have declined to reverse convictions, even on a showing of an improper denial of a motion for a continuance, absent a showing of specific prejudice. *Id.*; *State v. Davenport*, 08-463 (La. App. 5 Cir. 11/25/08), 2 So.3d 445, 447, *writ denied*, 09-158 (La. 10/16/09), 19 So.3d 473 (citing *State v. Bartley*, 03-1382 (La. App. 5 Cir. 3/30/04), 871 So.2d 563, 567, *writ denied*, 04-1055 (La. 10/1/04), 883 So.2d 1006).

A motion for continuance based upon the absence of a witness must state all of the following:

(1) Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial.

(2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred.

(3) Facts showing due diligence used in an effort to procure attendance of the witness.

La. C.Cr.P. art. 709; *see State v. Scie*, 11-254 (La. App. 5 Cir. 12/28/11), 83 So.3d 1082, 1098. The requirements of Code of Criminal Procedure art. 709 are strictly enforced by the courts. *Shannon*, 6 So.3d at 716-17 (citing *State v. Arabie*, 07-806 (La. App. 5 Cir. 3/11/08), 982 So.2d 136, 142, *writ denied*, 08-928 (La. 11/21/08), 996 So.2d 1104); *see also State v. Meyers*, 95-750, 96-35, 96-395 (La. App. 5 Cir. 11/26/96), 683 So.2d 1378, 1388-89, *writs denied*, 97-15 (La. 5/9/97), 693 So.2d 766 and 98-2530 (La. 2/5/99), 737 So.2d 745; 00-995 (La. 12/8/00), 775 So.2d 1079 (This Court found no abuse of the trial court's discretion in denying the defendant's motion for a continuance on the basis of absent witnesses, whose testimony the defense claimed was exculpatory, where the defendant failed to meet two of the three requirements of Article 709.). It is questionable whether the defense satisfied any of the requirements set forth in Louisiana Code of Civil Procedure Article art. 709.

As to the first requirement, even if Mr. Johnson adequately communicated the facts Mr. Alexander was expected to testify to, he failed to demonstrate that the testimony was material to his defense and that Mr. Alexander's presence was necessary to communicate those facts to the jury.

The district court clarified with defense counsel that the facts Mr. Alexander was expected to testify to were (1) "that he dropped off Mr. Alexander that evening," and (2) "that he does not know Mr. Johnson to own a firearm." Defense counsel replied, "[y]es. And that he didn't see a gun when he dropped off Mr.

Alexander." Mr. Johnson asserts that such facts are material because, by prosecuting defendant for armed robbery with a firearm and convicted felon in possession of a firearm, whether or not defendant had a gun was at issue.

The State pointed out that Mr. Alexander had previously refused to speak to police regarding Mr. Johnson's arrest, and defense counsel admitted that Mr. Alexander expressed his intention to invoke the Fifth Amendment if called to testify. In *State v. Hopkins*, 351 So.2d 474, 478 (La. 1977), the fact that a witness *could* invoke the Fifth Amendment did not prevent the defendant from satisfying Code of Criminal Procedure art. 709(A)(1) when he sufficiently identified the facts the witness was "expected to testify" to.

However, in the *Rodriguez* case, the defense sought a continuance to compel the attendance of a jewelry store owner who was expected to testify that the defendant's crucifix, matching the one allegedly worn by the murderer, was being repaired at the time of the murder. 839 So.2d 106, 116. After a brief recess in which the defense attempted to locate the witness, the State told the court that the witness had communicated over the phone that he was not coming to court and that he knew nothing about the case. *Id.* at 117. The State also relayed the witness's statement that he had once repaired the cross that defendant's common-law wife wore to testify at trial, but he didn't remember fixing any other jewelry for her.[10] *Id.* at 117. This Court found that the defense failed to satisfy the first prong of Article 709 when the State indicated that the witness would not have testified as the defense asserted. The statements of the witness in *Rodriguez*, that he would not come to court and that he knew nothing about the case, are substantially similar to Mr. Alexander's statements to the defense attorney that he would invoke the Fifth Amendment and that he had "nothing of evidentiary value to add."

---

[10] The wife had testified at trial that the defendant's crucifix was at the jewelry store being repaired on the day of the murder, and she picked it up the day after the murder. *Id.* at 115.

In *State v. Davis*, the first prong of Article 709 was not satisfied when the defense counsel had not interviewed the witness prior to trial, rendering his statements as to the witness's expected testimony mere speculation, especially since the facts the defense hoped the witness would attest to contradicted previous statements he had given to the police. 550 So.2d 774, 780 (La. App. 2 Cir. 1989).

In this case, while defense counsel stated that she had spoken to the witness twice, her interviews with the witness revealed that he would most likely invoke the Fifth Amendment. Furthermore, her statement of the facts to which the witness was expected to testify came as the result of a conversation with defendant, not with the witness.

Finally, Article 709 is not satisfied when the absent witness's testimony is irrelevant or of very little probative value when weighed against other legitimate considerations in the administration of justice. *See, e.g.*, *State v. Luna*, 00-858 (La. App. 5 Cir. 10/31/00), 772 So.2d 249, 257, *writ denied*, 00-3244 (La. 10/12/01), 799 So.2d 495. In this case, the court found that whether Mr. Alexander dropped Mr. Johnson off at the scene of the kidnapping that night and whether he had ever known Mr. Johnson to have a gun were immaterial to the defense's case. We agree. Mr. Johnson admitted meeting with Mrs. Crider in the vicinity of the shopping center that evening, and Mrs. Crider herself recounted that after the first press of "cold metal against [her] face" she never saw, felt, or perceived a gun. Proof that Mr. Alexander dropped Mr. Johnson off would merely have established his presence at the scene because Mr. Alexander was not expected to testify that he knew of Mrs. Crider or her alleged penchant for cocaine. Furthermore, testimony regarding whether Mr. Alexander knew Mr. Johnson to own a gun or saw him with one on the evening of the kidnapping is merely corroborative of Mr. Johnson's testimony in his own defense and has little additional probative value. Furthermore, as discussed below, given the jury's verdict in this case, apparently

the jury credited Mr. Johnson's testimony regarding the absence of a gun without Mr. Alexander's corroborating testimony, speculative as it would have been, on the gun issue.

Mr. Johnson also failed to satisfy the second prong of Code of Criminal Procedure art. 709—requiring a statement of facts showing "a probability that the witness will be available at the time to which the trial is deferred." Mr. Johnson asserts that the second prong was satisfied because he located Mr. Alexander and issued a writ to the Department of Corrections to procure the witness' presence; thereafter, it was the state's responsibility to produce Mr. Alexander for trial. However, when Mr. Alexander's absence was pointed out on the second day of trial, he was 200 miles from the courthouse and out of reach until after 7:00 p.m. The district judge stated, "No one has told me that he can be transported or would be transported by tomorrow for the trial." There is no evidence that at the beginning of the first trial day the defense either informed the court of any potential witness availability problem or sought information from the Jefferson Parish Sheriff to assure herself and the court that Mr. Alexander had either been transported or was *en route*. Further, a witness's invocation of the Fifth Amendment, renders the witness statutorily unavailable to testify. La. Code Evid. Art. 804(A)(1); *State v. Bright*, 98-0398 (La. 4/11/00), 776 So.2d 1134, 1156. Therefore, the defense failed to show a probability that Mr. Alexander would be present and available to testify if the recess were granted.

As to the defense's exercise of "due diligence used in an effort to procure [the witness'] attendance," the writ of habeas corpus alleged that Mr. Alexander was "now confined" in the C. Paul Phelps Correctional Center, a facility that had ceased to exist in 2012, and the record does not reflect that Mr. Alexander's presence was requested on the day trial was set to begin. Having spoken to Mr. Alexander on two occasions prior to trial, it is reasonable to conclude that defense

counsel could have ascertained the witness' actual location for purposes of serving the writ. Additionally, the record does not establish that the writ required Mr. Alexander's presence any earlier than May 15, 2019, when it was established on May 13, 2019 that the State would rest on the second day of trial.

Finally, in addition to satisfying each element of Article 709, a defendant is required to prove that the denial of the continuance was prejudicial error in order to succeed in having the decision reversed, meaning the defendant must show, "that the testimony that the witness would have given would have been favorable to the defense and would indicate the possibility of a different result." *State v. Luna*, 772 So.2d 249, 256 (citing *State v. Nicholas*, 97-1991 (La. App. 4 Cir. 4/28/99), 735 So.2d 790, *writ denied*, 99-1511 (La. 10/29/99), 748 So.2d 1159). Had Mr. Alexander testified, the jury could have believed him. In that case, the jury could have reasonably concluded that Mr. Johnson did not have a gun when he was dropped off at the shopping center on November 18, 2016. However, it does not follow that the jury would have returned any verdict other than the verdict arrived at in this case. Mr. Johnson was acquitted of being a felon in possession of a firearm, and the jury convicted him of first degree robbery rather than armed robbery. First degree robbery results when a defendant causes the victim to reasonably believe he is armed with a dangerous weapon for the purpose of accomplishing the crime. La. R.S. 14:64.1. Therefore, it appears that the jury may have believed Mr. Johnson's testimony that he did not have a gun with him that evening, even without Mr. Alexander's corroborating testimony.

Therefore, for all the aforementioned reasons, we find that the district judge did not abuse his discretion in denying the motion for recess.

# III. ERRORS PATENT DISCUSSION

The record was reviewed for errors patent, according to Louisiana Code of Criminal Procedure art. 920; *State v. Oliveaux*, 312 So.2d 337, 338 (La. 1975); and *State v. Weiland*, 556 So.2d 175, 178 (La. App. 5 Cir. 1990).

The State of Louisiana Uniform Sentencing Commitment Order (UCO) included in the record reflects that the date of the charged offense for count two was November 21, 2016. The record reflects all three counts were committed on November 18, 2016. The amended bill of information corrects the date of the offense on count two. This Court has previously remanded a case for correction of the UCO in its error patent review, including to correct the date of the offense. *See State v. Lyons*, 13-564 (La. App. 5 Cir. 1/31/14), 134 So.3d 36, 41, *writ denied*, 14-481 (La. 11/7/14), 152 So.3d 170 (citing *State v. Long*, 12-184 (La. App. 5 Cir. 12/11/12), 106 So.3d 1136, 1142). While Mr. Johnson was acquitted of this charge, as this matter is being remanded to correct other errors, we order on remand that the UCO be amended to reflect the corrected date contained in the amended bill of information for count two.

Also, there appears to be an inconsistency between the May 23, 2019 transcript and the sentencing minute entry regarding the amount of court costs imposed. The transcript reflects that the trial court ordered defendant to "pay court costs in the amount of $451.50 within 180 days of today's date." However, the minute entry for May 23, 2019, reflects that defendant has 180 days to pay court costs in the amount of $451. The record does not contain a payment schedule or otherwise address the court costs, but the trial court reiterated on October 17, 2019—when sentencing Mr. Johnson on a multiple bill for count one—that "[a]ny outstanding court costs, fines and fees are still due, are converted to a civil money judgment." It is well settled that when the transcript and the minute entry conflict,

the transcript prevails. *State v. Lynch*, 441 So.2d 732, 734 (La. 1983); *State v. Batiste*, 06-824 (La. App. 5 Cir. 3/13/07), 956 So.2d 626, 637, *writ denied*, 07-892 (La. 1/25/08), 973 So.2d 751. Correction of the May 23, 2019 minute entry to reflect the full court costs is required upon remand as well.

For the aforementioned reasons, this matter is remanded to the district court for amendment of the UCO to correct the date of the offense on count two and correction of the May 23, 2019 minute entry to reflect the transcript, assigning court costs in the amount of $451.50. Thereafter, we direct the Clerk of Court to transmit the new and corrected commitment to the officer in charge of the institution to which Mr. Johnson has been sentenced, as well as, to the legal department of the Louisiana Department of Public Safety and Corrections. In all other respects, Mr. Johnson's convictions and sentences are affirmed.

**<u>CONVICTIONS AND SENTENCES AFFIRMED; REMANDED WITH INSTRUCTIONS</u>**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

MARY E. LEGNON
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**SEPTEMBER 9, 2020** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

CURTIS B. PURSELL
CLERK OF COURT

## 19-KA-547

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HON. SCOTT U. SCHLEGEL (DISTRICT JUDGE)
ANNE M. WALLIS (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          BERTHA M. HILLMAN (APPELLANT)

### MAILED
HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
TUCKER H. WIMBERLY (APPELLEE)
ZACHARY P. POPOVICH (APPELLEE)
ASSISTANT DISTRICT ATTORNEYS
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053